THE HON. JOHN H. CHUN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

KRISTI SMITH,

                            Plaintiff,

     v.

CLOVER PARK SCHOOL DISTRICT NO.
400,

                          Defendants.

No. 3:21-cv-05767-JHC

**Plaintiff's Opposition to Defendant Clover Park School District No. 400's Summary Judgment Motion**

NOTE ON MOTION CALENDAR: November 18, 2022

PL.'S OPP. TO DEF.'S
SUMM. J. MOT.
(No. 3:21-cv-05767-JHC)



BECK CHASE GILMAN PLLC
705 S. Ninth St., Suite 305
Tacoma, WA 98405
253.289.5104

A school administrator's option to informally meet with the school board about a transfer, during a ten-day window, does not insulate school districts from liability under the WLAD or FMLA. Neither law requires exhaustion of remedies, and the District cites no case in which a WLAD or FMLA claim was dismissed based on RCW 28A.405.230, as that is not the law.

The remainder of the District's motion boils down to its spin on the facts, or the ignoring of inconvenient ones. Perhaps most notably, the District never mentions Smith's testimony that Banner said shortly before her injury that he (1) wanted Smith to be his second-in-command, (2) intended to give her the official Deputy Superintendent title the following year; and (3) did not trust Brian Laubach—who had just challenged him for the Superintendent position. Banner denies the conversation. But the jury can certainly infer that the reason Banner (a) gave Smith, "oversight and responsibility for most of the departments and programs" historically overseen by the Deputy Superintendent (Dkt. 29 at 7:22–24, 12:21–23); (2) moved Smith into the Deputy's physical office; and (3) never told *anyone*—including Laubach—that he was considering Laubach for Deputy was because Banner wanted Smith in that role. All of this changed after Smith's disability. The District is keenly aware of these disputed facts. Its failure to articulate them for the Court means the District never even meets its initial burden to show there are no issues for trial. Summary judgment should be denied.

## I.    Facts[1]

### A. Before her injury, Banner tells Smith he wants her to be his Deputy, assigns her the historic duties of the Deputy, and moves Smith into the Deputy's office.

In May or June of 2019, during the transition period between Banner being named Superintendent and officially assuming the role, Banner and Smith spent a lot of time discussing the organization of the administration. Ex. A (Smith Dep. at 71:21–73:8, 74:10–75:13, 76:5–25, 77:5–15, 79:11–21, 80:3–82:3). To that point, the two had worked closely as administrators and had a great relationship. *Id.* at 65:14–15, 67:5–7. Banner told Smith he wanted to move her into

---

[1] To avoid duplication, Smith incorporates by reference the facts and citations to the record set forth in her own motion for partial summary judgment and reply. *See* Dkts. 22 and 33. New exhibits supporting this opposition are referenced as "Ex. ___" and are attached to the accompany Gilman declaration, unless otherwise stated.



the Deputy *role* (*id.* at 72:8–9) but did not know if he could give her the Deputy *title* that year. *Id.* at 72:17–20 ("He said, I don't know if I can swing it this year to be deputy superintendent because I have to use the extra money that I have to go towards adding another executive director . . . ."); 76:11–16 ("Ron wanted me to do that work and he wasn't sure if the title would be deputy superintendent or assistant superintendent. And when he didn't have the budget because of the other move, he said it's going have to be assistant superintendent for this year."); ("What the title would be, I was not sure . . . but I knew that I would be in that position.").[2]

Consistent with these discussions, the parties agree that Banner promoted Smith and gave her "oversight and responsibility for most of the departments and programs" that were "[h]istorically" overseen by the Deputy Superintendent. Dkt. 29 at 7:22–24, 12:21–23; *see also* Smith Dep. at 74:18–24 ("I was moving over into his office that he was vacating as deputy sup . . . and took on those responsibilities . . . [t]hat he had as deputy sup.").

Prior to Banner's elimination of the Deputy title, there had only been one year, the 2017–2018 school year, where the District did not have a Deputy.[3] The reason was because a previous superintendent, Debbie LeBeau, had lost confidence in Deputy Superintendent Brian Laubach's abilities. Ex. D (McStay Dep. at 45:8–46:1 ("concerns . . . had emerged in terms of his performance")). Laubach's review for that year scores him as "Basic" or "Unsatisfactory" on several criteria. Ex. F. He received a mid-year "letter of expectation" and was placed on a months-long improvement plan. *Id.* (CPSD001208). It failed. Among other things, Laubach's "[c]ommunication was a significant concern. Often, several requests for progress, a decision or information about a situation must be made before a response is given by Brian." *Id.* As Superintendent, Banner had access to Laubach's personnel records, including the "letter of expectation." Ex. D (McStay Dep. at 47:5–11).

---

[2] The District testified that titles often change without any change in duties. Ex. D (Davis 30(b)(6) at 96:22–23 ("we're educators and we like to change titles. His duties stayed the exact same.")). Titles are "[f]or the most part" primarily meant to distinguish compensation levels. *Id.* at 129:13–17.

[3] The District says the position "was vacant for two years before Banner" (Dkt. 29 at 4:23) but the District's organizational charts and Banner's testimony confirm that it was one. Dkt. 23 96–97, 117.

BECK CHASE GILMAN PLLC
705 S. Ninth St., Suite 305
Tacoma, WA 98405
253.289.5104

Banner was named Deputy for the 2018–2019 school year. Dkt. 23 at 117. He did not earn his superintendent's credentials until 2020 or 2021.[4] Ex. B (Banner 30(b)(6) at 11:13–15).

**B. Smith endures mistreatment almost immediately after her injury and makes numerous complaints that the District does not investigate per its own policies.**

After Smith injured her head, she began to experience harassment from her colleagues. She described many of the issues in her discovery responses and testified to them at length. Ex. G Interrog. No. 13; *see* Ex. A (Smith Dep. at 251:17–253:3, *passim*). Smith made several complaints to the District's administration about how she was being treated because of her injury and limitations. For example, on September 6, 2019, Smith handed a letter to McStay reporting that she was being held to "double standard" and experiencing "targeting behaviors from members of the district." Smith Decl., Ex. A. She sent a similar email to McStay and Banner the same day, explaining that the environment was not supportive of her recovery. Dkt. 23 at 241.

On April 19, 2020, Smith emailed another complaint stating "the District has not followed its own anti-discrimination/retaliation policies or the various laws on these subjects." Ex. H–I. On June 22, 2020 Smith submitted a charge of discrimination to the Washington Human Rights Commission. Ex. J. On October 6, 2020, Smith emailed another complaint to Banner and McStay, reiterating that "since my head injury, I have experienced discrimination, retaliation, and a hostile work environment." Ex. K. Smith also made numerous verbal reports about how she was being treated. Ex. A (Smith Dep., *e.g.*, at 91:6–107:1); Smith Decl. at ¶ 5; Ex. G.

The District must investigate even potential discrimination that it becomes aware of, regardless of whether a complaint is filed. Ex. D (McStay Dep. at 37:1–15); Ex. L (Smith_000548). This investigation must be "impartial." Ex. D (McStay Dep. at 30:16–31:23); Ex. L (Smith_000555). Those who may have participated in the discrimination should not have

---

[4] The District inaccurately asserted: "*After* . . . receiving . . . Superintendent credentials, Banner advanced [to] Deputy Superintendent, and, ultimately, Superintendent." Dkt. 32 at 4:15–18 (emphasis added). This misrepresentation was *added* to the District's factual recitation (*compare* Dkt. 29 at 4:12–14) to support one of the District's central assertions in opposition to partial summary judgment: that Smith "lacked the superintendent credentials she *needed* to serve as backup to the Superintendent." Dkt. 32 at 3:10–11 (emphasis added).

BECK CHASE GILMAN PLLC
705 S. Ninth St., Suite 305
Tacoma, WA 98405
253.289.5104

any involvement in the investigation. Ex. D (McStay Dep. at 31:13–9); Ex. L (Smith_000555). And the District cannot have an attorney–client relationship with any outside investigator. Ex. L.

The District never investigated potential discrimination against Smith. Ex. D (McStay Dep. at 162:14–164:10). The report emailed on April 19, 2020 was directed at Banner and McStay's conduct and was responded-to by McStay, with Banner's input. Ex. H. The District hired an attorney to investigate Smith's October 6, 2020 complaint but then refused to waive the attorney–client privilege with that attorney, despite requests from Smith's counsel. Ex. M. The District ended that investigation claiming that Smith failed to cooperate with its attorney/investigator. Ex. N.

## C. Banner initiates an investigation into an employee who merely voiced her observation that Banner and the administration were making it difficult for Smith to succeed.

While the District never investigated potential discrimination against Smith, Banner did launch an investigation into Holly Shaffer, a Director who voiced her observation that "Smith quickly fell out of favor with Superintendent Banner and the District's administration after she suffered a head injury . . . ." Shaffer Decl. at ¶ 4. Shaffer not only witnessed other administrators mocking and mistreating Smith based on her medical condition; she regretfully participated in it. *Id.* at ¶¶ 4–6. Shaffer reported this to the District's two highest-ranking HR professionals; neither asked the identity of the others involved in Smith's mistreatment. *Id.*; *see* Ex. D. (McStay Dep. at 117:18–128:14; Ex. O.

Shaffer also made a formal complaint against Banner, stating that "the superintendent's request in this matter was intimidation." Shaffer Decl., Ex. A ("I believe that there will be others like me who might feel afraid or intimidated by Mr. Banner's words and/or actions and will not speak up."). McStay prepared the District's response. *Id.*, Ex. B. But McStay "mischaracterized what [Shaffer] said and conceal[ed] the basis of [Shaffer's] complaint: that Superintendent Banner was trying to intimidate [Shaffer] because [she] expressed [her] observations that he and others were trying to make it difficult for Ms. Smith to succeed." *Id.* at ¶15, Ex. C.

Beck Chase Gilman PLLC
705 S. Ninth St., Suite 305
Tacoma, WA 98405
253.289.5104

## II.   Argument

### A.  Summary judgment is rarely granted to employers

"In reviewing motions for summary judgment in the employment discrimination context, a court must zealously guard[ ] an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses." *Weil v. Citizens Telecom Servs. Co., LLC*, 922 F.3d 993, 1002 (9th Cir. 2019) (internal quotes omitted). "[V]ery little . . . evidence is necessary to raise a genuine issue of fact regarding an employer's motive; any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a factfinder." *Id.*

### B.  The statute governing administrative transfers of school administrators, RCW 28A.405.230, does not insulate school districts from WLAD or FMLA lawsuits.

The District's request for dismissal of WLAD or FMLA claims based on RCW 28A.405.230 is unpersuasive. At the outset, Smith's lawsuit does not assert that the District violated her procedural rights under RCW 28A.405.230, which covers "Notice—Procedure" for transferring administrators. Rather, Smith alleges, *inter alia*, that her disability and protected activities were a substantial factor in the District's adverse employment decisions. The District's witnesses, policies, and contracts all acknowledge that a superintendent cannot transfer administrators for discriminatory or retaliatory reasons. Dkt. 23 at 127; Ex. E (Santorno Dep. at 96:15–97:2, 99:14–16, 100:4–10); Dkt. 30-1 at 2 (transfers under contract subject to limitations under Washington law), 18 (Policy No. 5211 (changes must be "according to law.")). Legally, it can never be "in the best interests" of a district (RCW 28A.405.230), to violate the WLAD or FMLA. *E.g.*, RCW 28A.642.010.

#### 1.  There is no administrative exhaustion requirement under the WLAD or FMLA.

"There is no requirement to exhaust administrative remedies before commencing a suit under the WLAD." *Cloer v. United Food & Com. Workers Int'l Union*, C05-1526JLR, 2007 WL 601426, at *5 (W.D. Wash. Feb. 22, 2007). Likewise, "the FMLA does not require a plaintiff to exhaust administrative remedies." *Obispo v. United States Postal Serv.*, LA-CV-2002426-JAK-



MAAX, 2021 WL 6618884, at *5 (C.D. Cal. Mar. 17, 2021) (internal quotation marks omitted).

Nonetheless, the District says Smith's WLAD and FMLA claims should be dismissed "for the failure to exhaust all administrative remedies." Dkt. 29 22:24. This argument fails on every front.

**2. The District cites Washington cases about requests for courts to exercise inherent but "entirely discretionary" review authority, not WLAD or FMLA claims.**

The Washington cases the District cites did not involve WLAD or FMLA claims. *Odegaard v. Everett School District No. 2* involved a principal who was "demoted" to a teaching position due to "concerns about her effectiveness as a principal . . . ." 55 Wn. App. 685, 686–87, 780 P.2d 260 (1989). Unlike here, the plaintiff asked the court to exercise its "entirely discretionary" "inherent powers to review 'administrative actions which may be deemed arbitrary and capricious or illegal.'" *Id.* at 690–91 (quoting *Bridle Trails Cmty. Club v. Bellevue*, 45 Wn. App. 248, 253, 724 P.2d 1110 (1986)). It was in *this* context that the court said *discretionary* review "'is rarely granted where a petitioner has failed to take advantage of another avenue of review without an adequate excuse.'" Dkt 29 at 21:8–10 (quoting *Odegaard*, 55 Wn. App. at 691).

Critically, the ruling was based on the fact that the plaintiff already "ha[d] an adequate remedy to address her allegations" in the form of "a second lawsuit. . . ." *Odegaard*, 55 Wn. App. at 691; *see also Bridle Trails*, 45 Wn. App. at 253–54 (declining *discretionary* review based other "possible avenues to obtain judicial review"). The assertion that transfers "may be judicially reviewed *only* via the court's inherent power" (Dkt. 29 at 11:4–5 (emphasis added)) is incorrect.[5]

**3. Smith is invoking statutory rights to pursue her WLAD and FMLA claims in court.**

Smith is not asking for discretionary review of the District's process. She is invoking her *mandatory statutory rights* to pursue her statutory claims *in court*. "Any person deeming . . .

---

[5] Underscoring the absence of authority for its position, the District also cites *Jones-Almlie v. Puyallup School District*, 2005 WL 1178087 (2005) (unpublished), a case involving an administrator who was demoted "because of perceived difficulties she was having being [an] effective leader . . . ." *Id.* at *1. Her "sole argument on appeal" was that the letter notifying her of her transfer "failed to identify the specific subordinate certificated position to which she would be transferred," an argument she raised for the first time 20 months later in response to summary judgment. *Id.* at *2. The court declined to exercise its discretion to review the alleged procedural defect because the plaintiff did not raise it during the informal meeting, which "suggests that at the time she tendered her resignation, the specific nature of her new assignment was not relevant." *Id.* at *4. The case did not concern the WLAD or FMLA. The opinion has "no precedential value," is "not binding on any court" and cannot be cited in Washington courts. GR 14.1(a); *see also* RCW 2.06.040.

herself injured by any act in violation of [the WLAD] *shall* have a civil action *in a court* of competent jurisdiction . . . ." RCW 49.60.030(2) (emphasis added.)). The WLAD's protections are expressly grafted onto the state's educational employment framework:

> **RCW 28A.400.310 — Law against discrimination applicable to districts' employment practices.**
>
> The provisions of *chapter 49.60 RCW* [the WLAD] . . . *shall be applicable to the employment of any certificated or classified employee by any school district organized in this state.*

(Italics added.); *see also* RCW 28A.642.010 (discrimination, per the WLAD, "is prohibited" in public schools); RCW 28A.642.020 (prohibition "applies to public school employment"). "Any" school district employee aggrieved by a WLAD violation "has a *right* of action in superior court . . . ." RCW 28A.642.040 (emphasis added). Smith is also invoking her right to seek relief under the FMLA "in any Federal or State court . . . ." 29 U.S.C. § 2917(a)(2). State legislation, of course, cannot insulate employers from federal law. *E.g., Byrd v. Cal. Super. Ct., Cnty. of Marin*, C 08-04387MHP, 2009 WL 2031761, at *9 (N.D. Cal. July 8, 2009) ("To allow a state to grant statutory immunity to any federal law would contravene the Supremacy Clause. . . . Any claim arising under the FMLA is a federal claim and state law does not apply.").

### 4. Judicial deference is not required as the option to "meet informally" with the board has no equivalence to proceedings where exhaustion is actually required.

The option "to meet informally with the board" (RCW 28A.405.23)—what the District calls an "appeal"—"'is only a shadow of a judicial hearing.'" *Odegaard*, 55 Wn. App. at 688 (quoting *Williams v. Seattle Sch. Dist. 1*, 97 Wn.2d 215, 219, 643 P.2d 426 (1982)). School boards have neither the expertise nor procedural protections to determine if their own superintendents violated the WLAD or FMLA.[6] This is not a circumstance, like those cited by the District, where

---

[6] The District cites *McLain v. Kent Sch. Dist. No.* 415, 178 Wn. App. 366, 314 P.3d 435 (2013) for the proposition that "plaintiff waived right to appeal under RCW 27A.405.230 by failing to comply with statutory deadlines." Dkt. 29 at 21:13–14. But *McLain* never mentions that provision. Instead, the opinion, which concerns the nonrenewal of a teacher contract for "lack of improvement during [a] probationary period," analyzes a different statutory framework requiring, among other things, a formal hearing before a neutral hearing officer, subject to the rules of evidence, with the ability to conduct discovery and subpoena witnesses and documents. RCW 28A.405.310; *compare with* RCW 28A.405.230 ("opportunity to meet informally with the board"). Still, the District can cite no case where an educator was required to follow RCW 28A.405.310 before suing under the WLAD or FMLA.

BECK CHASE GILMAN PLLC
705 S. Ninth St., Suite 305
Tacoma, WA 98405
253.289.5104

courts should defer to the judgment of school boards, "even if [it] is erroneous." Dkt. 29 at

11:12–13 (citing *State v. Ford*, 110 Wn.2d 827, 830 (1988) (deferring to state toxicologist's

approval of device to measure breath alcohol content where "the Legislature has validly

delegated" that task); *Equitable Shipyards, Inc. v. State*, 93 Wn.2d 465, 611 P.2d 396 (1980)

(reviewing State Transportation Commission's award of ferry construction contract); *Helland v.*

*King Cnty. Civil Serv. Comm'n*, 84 Wn.2d 858, 529 P.2d 1058 (1975) (reviewing King County

Civil Service Commission's refusal to give credit for answer on civil service test); *Wallace v. Emp.*

*Sec. Dep't of State of Wash.*, 51 Wn. App. 787, 788, 755 P.2d 815 (1988) (review of ESD's denial of

unemployment compensation)); *see also Matter of Stockwell*, 28 Wn. App. 295, 296, 622 P.2d 910

(1981) (reviewing "declaration of unprofessional conduct by the Washington State Chiropractic

Disciplinary Board.").

### 5. For its "exhaustion rule," the District cites 42 U.S.C. § 1983 cases that were overruled decades ago since Congress never required exhaustion under § 1983.

The federal cases the District relies upon are also inapposite as they analyze claimed denials

of due process under 42 U.S.C. § 1983. *See Kilroy v. Los Angeles Unified Sch. Dist.*, CV-1609068-

DMGJDE, 2018 WL 7916367, at *8 (C.D. Cal. Dec. 6, 2018) (magistrate's recommendation);

*Bignall v. N. Idaho Coll.*, 538 F.2d 243, 244–45 (9th Cir. 1976); *Whitner v. Davis*, 410 F.2d 24, 26

(9th Cir. 1969), *overruled by Patsy v. Board of Regents*, 457 U.S. 496, 102 S. Ct. 2557, 73 L. Ed. 2d

172 (1982); *Toney v. Reagan*, 467 F.2d 953, 967 (9th Cir. 1972).[7] Any exhaustion requirement

applicable to section 1983 procedural due process claims has no bearing on Smith's claims.

That said, the so-called "*Whitner* exhaustion rule" that the District hopes to apply was

overruled by the Supreme Court in *Patsy*, as recognized by the Ninth Circuit. *Heath v. Cleary*,

---

[7] The opinion in *Parisi v. Davidson*, 405 U.S. 34, 92 S. Ct. 815, 31 L. Ed. 2d 17 (1972)—a habeas proceeding by a serviceman seeking discharge from the Army—is even further divorced from the facts of this case. *See Cole v. Spear*, 747 F.2d 217, 220 (4th Cir. 1984) (*Parisi* governs "the jurisdiction of the federal civilian courts to intervene in the military system of justice."). Smith's case does not concern Army Regulation 635-20 or an appeal to the Army Board for Correction of Military Records. *See Parisi*, 405 U.S. at 38.

Beck Chase Gilman PLLC
705 S. Ninth St., Suite 305
Tacoma, WA 98405
253.289.5104

708 F.2d 1376, 1378 (9th Cir. 1983).[8] "*Patsy* effectively overrules the *Whitner* exhaustion rule." *Id.* at 1378 n.2. The cases the District cites for its "rule"—*Whitner* (1969), *Bignall* (1976), *Toney* (1972), and *Parisi* (1972)—predate *Patsy* and have not been good law for over 40 years.[9] And even if the *Whitner* exhaustion rule applied (it does not) and was still good law (it is not), the question of whether "the administrative remedy . . . was adequate . . . ought not [be] determined on . . . a motion for summary judgment" because, under the old framework, this presents a question of fact. *Whitner*, 410 F.2d at 29 (overruled). As noted, RCW 28A.405.230's informal meeting option is wholly inadequate for assessing potential violations of the WLAD or FMLA.

### 6. The District's proposed exhaustion rule would produce absurd results.

The "purpose of the [WLAD] is to deter and to eradicate discrimination in Washington"— "a public policy of the highest priority." *Int'l Union of Operating Eng'rs, Local 286 v. Port of Seattle*, 176 Wn.2d 712, 721, 295 P.3d 736 (2013) (quote marks omitted). "The overarching importance of eradicating such discrimination requires that WLAD's provisions 'be construed liberally for the accomplishment of the purposes thereof.'" *Jin Zhu v. N. Cent. Educ. Serv. Dist.-ESD 171*, 189 Wn.2d 607, 622, 404 P.3d 504 (2017) (quoting RCW 49.60.020).

Here, the District's exhaustion rule would reduce the period to bring WLAD claims from three years to ten days. *See Antonius v. King Cnty.*, 153 Wn.2d at 261–62, 103 P.3d 729 (2004); *Allbaugh v. Perma-Bound*, C08-5713-JCC, 2009 WL 10676437, at *5 (W.D. Wash. Aug. 14, 2009)

---

[8] The Supreme Court explained that "the initial question whether exhaustion is required should be answered by reference to congressional intent; and a court should not defer the exercise of jurisdiction under a federal statute unless it is consistent with that intent." *Patsy*, 457 U.S. at 501–02. Legislative bodies have "superior institutional competence" to decide whether exhaustion is appropriate. *Id.* at 511–53 ("It is not our province to alter the balance struck by Congress in establishing the procedural framework for bringing actions under § 1983."). The same deference is owed to Washington's legislature, which knows how to express when exhaustion is required. *See, e.g.*, RCW 64.40.030 ("Any action . . . shall be commenced only within thirty days after all administrative remedies have been exhausted.").

[9] In *Kilroy*, the magistrate quotes the same language from *Bignall* and *Parisi* as found in the District's motion. *Compare* 2018 WL 7916367, at *9 *with* Mot. at 22:2–9. In that unpublished opinion, the *pro se* plaintiff apparently accepted the analytical framework that previously existed under *Whitner*, not realizing the case had been overruled. *See* 2018 WL 7916367, at *9 ("*According to Plaintiff*, because his due process rights had already been violated" no administrative hearing was required to pursue his section 1983 claims. (Emphasis added.)). The opinion never mentions *Heath* or *Patsy*, which recognized that administrative exhaustion is not required regardless of timing. The Ninth Circuit affirmed in an unpublished two-paragraph memorandum that does not mention *Bignal* or *Parisi*. 810 Fed. App'x 559 (9th Cir. 2020). Rather, the court merely held that the notice the claimant received about his termination satisfied the requirements of due process under *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985). Again, Smith is not alleging a procedural due process violation.

BECK CHASE GILMAN PLLC
705 S. Ninth St., Suite 305
Tacoma, WA 98405
253.289.5104

("a 180-day limitations provision unreasonably favors employers [in WLAD cases] and is therefore substantively unconscionable."); *see also* 29 U.S.C. § 2617(c) (FMLA limitations period is two years, or three years if violation is willful). This would dramatically reduce the private enforcement on which the WLAD "heavily relies." *Jin Zhu*, 189 Wn.2d at 622. The District's proposal would also not "persuade[] potential harassers to refrain from unlawful conduct." *Local 286*, 176 Wn.2d at 722. It would do the opposite, with no legitimate policy objective to speak of.

### 7. The District did not plead failure to exhaust administrative remedies.

"The failure to exhaust administrative remedies is an affirmative defense that must be pleaded and proved by defendant." *Gergawy v. U.S. Bakery, Inc.*, 2:19-CV-00417-SAB, 2021 WL 608725, at *7 (E.D. Wash. Feb. 16, 2021). "Under the Federal Rules of Civil Procedure, a party, with limited exceptions, is required to raise every defense in its first responsive pleading, and defenses not so raised are deemed waived." *Lee v. ITT Corp.*, C10-0618-JCC, 2013 WL 12092549, at *3 (W.D. Wash. Dec. 6, 2013), *aff'd*, 662 Fed. Appx. 535 (9th Cir. 2016). A "nefarious motive" is not required; "an unintentional ambush is still an ambush[.]" *Id.*

Here, the District did not assert its novel theory that Smith failed to exhaust administrative remedies until it filed its instant summary judgment motion. *See* Dkt. 7. Smith served written discovery and sought a Rule 30(b)(6) deposition regarding the factual bases for the affirmative defenses pled. *See* Dkt. 20 at 5:10–6:5. The District said nothing about a supposed failure to exhaust. *Id.* The District's own expert on compliance with Ch. 28A RCW rejected the District's theory four days before the discovery cutoff.[10] Ex. E (Santorno Dep. at 120:4–20).

### C. The District did not return Smith to her same or equivalent position per the FMLA.

The District's argument to dismiss Smith's FMLA "interference" claim is a near-verbatim rehash of its opposition to partial summary judgment on the same claim. *Compare* Dkt. 29 at

---

[10] The District's failure to plead an exhaustion defense prejudices Smith, who could have engaged in early motion practice to seek its dismissal or targeted discovery regarding the board's informal meeting practices—for instance, has the board *ever* reversed a superintendent's personnel decision? The District was also able to avoid Smith's affirmative summary judgment motion. *See* Dkt. 22 (seeking dismissal of all defenses *pled* by the District).

BECK CHASE GILMAN PLLC
705 S. Ninth St., Suite 305
Tacoma, WA 98405
253.289.5104

1  13:17–16:6 *with* Dkt. 32 at 10:1–13:19. Smith has addressed these arguments. Dkt. 33 at 3:17–5:15.

2  The job was not equivalent. Ex. A (Smith Dep. at *e.g.*, 9:22–14:18, 28:8–24, 29:4–31:16)

3      "In this circuit, we have declined to apply the type of burden shifting framework recognized

4  in *McDonnell Douglas* to FMLA 'interference' claims; rather, [an employee] can prove this claim,

5  as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or

6  both." *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir. 2011). Intent is not an element. *Id.*

7  Inasmuch as the District suggests otherwise (Dkt. 29 at 17:17–19), it is incorrect.

8  **D.  Issues of material fact preclude summary judgment on Smith's WLAD claims.**

9      "[S]ummary judgment to an employer is seldom appropriate in the WLAD cases because of

10  the difficulty of proving a discriminatory motivation." *Scrivener v. Clark Coll.*, 181 Wn.2d 439,

11  445, 334 P.3d 541 (2014). "To overcome summary judgment, a plaintiff needs to show only that a

12  reasonable jury could find that the plaintiff's protected trait was a substantial factor motivating

13  the employer's adverse actions." *Id.* "A 'substantial factor' means that the protected

14  characteristic was a significant motivating factor bringing about the employer's decision." *Id.* at

15  444 (citing *Mackay v. Acorn Custom Cabinetry, Inc.*, 127 Wn.2d 302, 311, 898 P.2d 284 (1995);

16  WPI 330.01.01. "It does not mean that the protected characteristic was the sole factor in the

17  decision" or even the "determining factor." *Id.* at 444–45. "When the record contains

18  reasonable but competing inferences of both discrimination and nondiscrimination, the trier of

19  fact must determine the true motivation." *Id.* at 445.

20      Here, the District lumps Smith's WLAD discrimination and retaliation (and FMLA) claims

21  together, arguing all should be dismissed "under *McDonnell Douglas*." Dkt. 29 at 17:15–21:5. But

22  these are distinct claims, though the District's only attacks their respective causation elements.

23  *Compare* WPI 330.32 *with* Dkt. 29 at 18:4–10. The *McDonnell Douglas* framework does not apply

24  where, as here, there is direct evidence of discrimination. *Alonso v. Qwest Commc'ns Co., LLC*,

25  178 Wn. App. 734, 743, 315 P.3d 610 (2013). And even under that framework, there is ample

26

27

Beck Chase Gilman PLLC
705 S. Ninth St., Suite 305
Tacoma, WA 98405
253.289.5104

evidence that the District's "reason is pretextual *or* . . . that discrimination . . . was a substantial motivating factor for the [District]." *Scrivener*, 181 Wn.2d at 447 (emphasis added).

### 1. Smith's *prima facie* case of WLAD discrimination based on direct evidence.

A WLAD disability discrimination claim has three elements: (1) The plaintiff has a disability; (2) is able to perform the essential functions of her job with reasonable accommodation; and (3) her disability or the perception of it was a substantial factor in an adverse employment action. WPI 330.32. The District's motion does not challenge the first or second elements, on which Smith separately moved for partial summary judgment. Dkt. 22 at 14:8–16:2. The District does not dispute that Smith had a disability. *See* Dkt. 33 at 2:20–23. And its argument to undermine its own direct testimony that Smith could perform the essential functions of her job is unavailing. *See id.* at 5:16–7:22. There is ample direct evidence supporting the third element.

"The *McDonnell Douglas* standard and the direct evidence method are merely alternative ways of establishing a prima facie case." *Kastanis v. Educ. Emps. Credit Union*, 122 Wn.2d 483, 490, 859 P.2d 26 (1993). "Under the direct evidence test, relevant here, the court determines whether the WLAD plaintiff has provided direct evidence that (1) the defendant employer acted with a discriminatory motive and (2) the discriminatory motivation was a significant or substantial factor in an employment decision." *Busey v. Richland Sch. Dist.*, 172 F. Supp. 3d 1167, 1180 (E.D. Wash. 2016), *aff'd,* 732 Fed. Appx. 577 (9th Cir. 2018).

Direct evidence exists where the defendant's employees openly mocked the plaintiff based on a protected status. *Alonso*, 178 Wn. App. at 745. In *Alonso*, other employees "openly mocked Alonso's speech impediment and accent[.]" *Id.* "This open mocking based on Alonso's national origin and speech impediment constitutes . . . direct evidence of discriminative intent, specifically relating to Alonso's protected disability and national origin statuses." *Id.*

Here, the District's administrators openly mocked Smith's disability, including feigning a head injury "as a way of mocking Ms. Smith." Shaffer Decl. at ¶ 5. Such conduct was pervasive: "Given its frequency and openness, the District's administration knew that Ms. Smith was being



BECK CHASE GILMAN PLLC
705 S. Ninth St., Suite 305
Tacoma, WA 98405
253.289.5104

mistreated because of her disability." *Id.* at ¶ 6. Indeed, jokes about Smith's disability occurred in front of Banner, *id.*, who did nothing to stop it. Ex. B (Banner 30(b)(6) at 189:13–190:12.

A decisionmaker's "[e]xpress invocation of a protected class" related to an adverse action is also direct evidence sufficient to defeat summary judgment. *Busey*, 172 F. Supp. 3d at 1180. In *Busey*, a former superintendent alleged marital status discrimination under the WLAD after he was terminated for having an intimate relationship with a subordinate. *Id.* at 1179–81. In holding that "Busey presented direct evidence that Defendants acted with a discriminatory motive ," the court explained: "In its letter of January 30, 2013, the Board specifically stated that it based its probable cause decision at least in part on Plaintiff's marital status: the Board twice classified Plaintiff's conduct as engaging in an 'extramarital affair' and further cited to the fact that Plaintiff met Ms. Hamilton 'while [he] was married.'" *Id.* at 1180. The court likened these statements to the kinds of "discriminatory statements by a decision maker and other smoking gun evidence of discriminatory motive" that Washington courts have recognized as direct evidence. *Id.* (citing *Fulton v. State*, 169 Wn. App. 137, 148 n.17, 279 P.3d 500 (2012)) (quote from *Fulton* with internal quotation marks omitted).

Here, Banner is less abashed than the school board in *Busey*. His January 24, 2020 memo to the school board expressly invokes Smith's disability as the reason for removing Teaching and Learning from her oversight—saying the change was made "to accommodate her needs" and "ensure consistency of leadership." Dkt. 23 at 204. As a Rule 30(b)(6) designee, Banner testified consistent with this memo, insisting that Teaching and Learning needed "consistent leadership and oversight" that Smith could not provide *because of her disability*. Dkt. 23 at 138–40. That decision was intertwined with Banner's decision to eliminate Smith's position and name Laubach Deputy Superintendent. *Id.* at 141–42. Other direct evidence includes the Post-It note that Banner affixed *to Smith's doctor's note outlining her temporary limitations*, articulating a "change in duties to—S.S." *Id.* at 53–54, 129–30, 234.

BECK CHASE GILMAN PLLC
705 S. Ninth St., Suite 305
Tacoma, WA 98405
253.289.5104

While the District claims it "merely acted pursuant to its educational interests" (Dkt. 29 at 21:2), that is not a question to be resolved on summary judgment. *See Busey*, 172 F. Supp. 3d at 1181 ("Although Defendants presented several seemingly legitimate non-discriminatory, conduct-based reasons for Dr. Busey's termination . . . it is for a jury to weigh the evidence and decide whether Plaintiff's direct evidence of discrimination . . . demonstrates his [protected] status was a substantial factor motivating Defendants' employment decision.").

**2. Smith's *prima facie* case of WLAD retaliation based on direct evidence.**

The elements of a WLAD retaliation claim are: "(1) the employee took a statutorily protected action, (2) the employee suffered an adverse employment action, and (3) a causal link between the employee's protected activity and the adverse employment action." *Cornwell v. Microsoft Corp.*, 192 Wn.2d 403, 411, 430 P.3d 229 (2018). The causation element only requires Smith to show that retaliation was a "substantial factor." *Allison v. Hous. Auth. of City of Seattle*, 118 Wn.2d 79, 96, 821 P.2d 34 (1991). Smith "does not have to prove that her [protected activity] was the only factor or the main factor in the decision, nor does Smith have to prove that she would not have [suffered adverse employment action] but for her [protected activity]. WPI 330.05. To the extent the District's brief implies it can escape liability by demonstrating Smith would have experienced the same adverse actions absent any discrimination or retaliation, that argument is inconsistent with the holding of *Allison*.

The same direct evidence supporting Smith's discrimination claim creates a jury question as to the causal link between the protected activities and adverse employment decisions discussed below. Moreover, if an employee establishes that the employer knew of an employee's protected activity and then imposed an adverse employment action, "then a rebuttable presumption is created in favor of the employee that precludes us from dismissing the employee's case." *Kahn v. Salerno*, 90 Wn. App. 110, 131, 951 P.2d 321 (1998); *see also Allison*, 118 Wn. at 90 n.3 ("This court in *Wilmot* required only that the plaintiff show 'that the worker filed a workers' compensation claim, that the employer had knowledge of the claim, and that the employee was



Beck Chase Gilman PLLC
705 S. Ninth St., Suite 305
Tacoma, WA 98405
253.289.5104

discharged.'" . . . . We find our formulation in *Wilmot* of what constitutes a causal connection for a prima facie case equally applicable in this [WLAD] case."). That is the case here.

The District's motion does not challenge elements one or two. Smith separately moved for partial summary judgment on these elements. Dkt. 22 at 16:4–17:11. In response, the District argued that requesting or taking leave or accommodations related to one's disabilities is *not* statutorily protected activity—essentially, that an employer *can* retaliate against an employee who does so. Dkt. 32 at 14:3–5. That argument fails. *See* Dkt. 33 at 8:1–9:10; Smith Decl., Ex. B. The District also does not substantively dispute that "'demotion' and 'reducing an employee's . . . pay' are quintessential adverse employment actions." Dkt. 33 at 3:6–8 (quoting *Kirby v. City of Tacoma*, 124 Wn. App. 454, 465, 98 P.3d 827 (2004)); Smith Decl., Ex. B.[11]

While Smith's summary judgment motion presents *indisputable* examples of protected activity and adverse employment actions, these are not the *only* examples. In addition to seeking or taking leave or accommodations, Smith's protected activities also included:

- September 6, 2019 letter complaining of mistreatment based on her disability, which she handed to Lori McStay. Smith Decl. Ex. A.

- Verbally complaining to Banner and HR that the District's actions were unlawful. *E.g.*, Ex. A (Smith Dep. at 222:23–223:1); Smith Decl. at ¶ 5.

- Smith's April 19, 2020 "Concern" email and April 28 reply disputing the District's explanation that it had not violated the law. Ex. I.

- Smith's charge of discrimination, submitted to the Washington HRC. Ex. J.

- Smith's Public Records Act requests through counsel. Ex. M.

---

[11] The District repeatedly references Smith's "one-year contract" but never squarely articulates an argument on that point. *All* District administrators have one-year contracts because that is what the law requires. RCW 28A.400.315. The law was not enacted to allow school districts to make discriminatory or retaliatory employment decisions so long as they do so on an annual basis. Rather, the law exists to ease the administrative burden of tracking retirement benefits. *Id* (citing note following RCW 41.50.065 ("A standardized time period for school administrator contracts and a prohibition against retroactive revision of those contracts is needed to prevent potential abuses of the average final compensation calculation process.")). Smith is not claiming, like the plaintiffs in *Butler v. Republic School District*, that "the parties had an implied agreement for permanent employment." 34 Wn. App. 421, 661 P.2d 1005 (1983). Rather, a substantial factor in why the District did not renew Smith's contract was her disability and retaliation. Indeed, Smith is the *only* administrator to *ever* experience an "administrative transfer to a subordinate position" unrelated to performance.

Beck Chase Gilman PLLC
705 S. Ninth St., Suite 305
Tacoma, WA 98405
253.289.5104

- Smith's submission of a Tort Claim and filing of this lawsuit. *See* Dkt. 7 at ¶ 3.45.

Smith also experienced several other adverse employment actions beyond being demoted and having her compensation reduced. To establish that an employment action was adverse, the employee need only show that the action would dissuade a reasonable employee from engaging in protected activity. *Boyd v. State, Dep't of Soc. & Health Servs.*, 187 Wn. App. 1, 13, 349 P.3d 864 (2015). This includes, for example, "a demotion or adverse transfer, or a hostile work environment." *Id.* Critically, the proper inquiry is not whether an individual action is adverse, but rather whether a series of actions "taken together, were materially adverse." *Id.* at 14. "Accordingly, whether a particular action would be viewed as adverse by a reasonable employee is a question of fact appropriate for a jury." *Id.* at 13–14. Adverse employment actions experienced by Smith included, without limitation:

- Removal of Smith's oversight of Teaching and Learning. Dkt. 23 at 109.

- Giving Smith Student Services when she had almost no experience with the department and had to struggle to learn the new job due to her cognitive impairments. *Id.* at 21–22.

- Failing to engage in the WLAD's required "interactive process" before unilaterally determining that Smith's duties had to be removed to "accommodate her needs." *See* Dkt. 33 at 7:2–10; Ex. C (Davis 30(b)(6) at 27:19–29:8).

- The District's failure to investigate potential discrimination in accordance with its own investigative guidelines including after receiving Smith's September 6, 2019 email and letter complaining of different treatment based on her injury. *See* § I.B., *supra*.

- The District allowing a hostile work environment based on Smith's disability to persist, despite knowing that other administrators were openly questioning the veracity of Smith's injury and mocking Smith's limitations. *See* § I.C., *supra*.

- Banner's claim that he did not even consider Smith for the Deputy Superintendent position (after telling her before her injury that he wanted her in that role) and refusal to at least open the Deputy position for a competitive hiring process. Dkt. 23 at 159–60.

BECK CHASE GILMAN PLLC
705 S. Ninth St., Suite 305
Tacoma, WA 98405
253.289.5104

- Banner's refusal to exercise his discretion to appoint Smith to the Assistant Superintendent position vacated when Laubach was promoted to Deputy. Ex. B (Banner 30(b)(6) at 161:2–4. Once Smith learned that she could apply (despite Banner's comments that no other suitable positions were available for her), Banner refused to exercise his discretion to allow Smith to be considered. Ex. I.

- Smith's removal from Superintendent's Council and Banner's refusal to exercise his discretion to keep her on the council, despite her significant experience. Dkt. 23 at 45.

- The District's refusal to impartially investigate Smith's October 2020 complaint of discrimination by hiring a lawyer as its investigator and retaining the attorney–client privileged, in violation of its own investigation standards. Exs. L–N.

- Banner's refusal to exercise his discretion to appoint Smith to the Assistant Superintendent position vacated by Laubach, after the person the District hired in his place, Kevin Ikeda, was unsuccessful and left that job. Smith Decl., Ex. C.

The District offers no legitimate, non-retaliatory explanation for many of these actions, apparently treating the adverse actions in Smith's summary judgment motion (demotion and reduced compensation) as the *only* adverse actions in this case. *But see* Ex. G. As discussed in the next section, this does not meet the District's own burden of production, ending the inquiry.

**3. The District does not meet its burden to articulate legitimate, non-discriminatory and non-retaliatory reasons for the adverse employment actions directed at Smith.**

The burden "to articulate a legitimate, nondiscriminatory reason for the adverse employment action" is not just a given. *Scrivener*, 181 Wn.2d at 446. "To meet its burden, the employer *must explain why it selected the plaintiff in particular* for" the adverse actions. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1094 (9th Cir. 2008) (emphasis added). Here, the District says it *wanted* a Deputy and that reorganizations and reassignments are common (Dkt. 29 at 19:6, 20:3), but it never explains *why Smith*, of all the District's administrators, was not selected.

The District also never explains is *why*, amidst this "fluid" process, it selected Smith alone—a rising administrator, with an impeccable performance record, who had been entrusted

with "responsibility for most of the departments and programs" historically overseen by the Deputy (*Id.* at 7:22–24)—for elimination. The District acknowledges that it often shuffles its various administrative functions amongst administrators. Dkt. 29 at 20:3. Banner had not decided to eliminate Smith's position when he gave it to her, something he attributes to the "fluidity of admin positions shifts." Ex. B (Banner 30(b)(6) at 116:6–17). It does not say what changed.

As noted, the District also does not address most of the adverse employment actions that are part of Smith's retaliation claim. It follows that it does not offer a legitimate why, for instance, it did not engage in the required interactive process about removing Smith's duties, or why it did not investigate potential discrimination of Smith in accordance with its own policies.[12] Thus, the burden to show pretext never shifts back to Smith. *Scrivener*, 181 Wn.2d at 446 ("*If the Defendant meets this burden*, the third prong of the *McDonnell Douglas* test requires the Plaintiff to produce sufficient evidence" of pretext. (Emphasis added.)).

### 4. Smith also presents ample evidence of pretext under *McDonnell Douglas*.

The court need not reach the *McDonnell Douglas* framework. *E.g.*, *Alonso*, 178 Wn. App. at 743 n.10 ("Because we rely on direct evidence, we need not perform a *McDonnell Douglas* burden-shifting analysis."). But Smith has a prima facie case under that framework, too.

"An employee may satisfy the pretext prong by offering sufficient evidence to create a genuine issue of material fact either (1) that the employer's articulated  reason for its action is pretextual or (2) that although the employer's stated reason is legitimate, discrimination nevertheless was a substantial factor motivating the employer." *Scrivener*, 181 Wn.2d at 446–47. "An employee does not *need* to disprove each of the employer's articulated reasons to satisfy the pretext burden of production. Our case law clearly establishes that it is the plaintiff's burden at trial to prove that discrimination was a substantial factor in an adverse employment action, not the only motivating factor." *Id.* at 447 (emphasis in original). "An employer may be motivated by

---

[12] The District's argument to dismiss claims of retaliation under the FMLA and WAFMLA suffer from the same defects. The District artificially limits the universe of protected activity and adverse actions to the one September 6, 2019 email that Smith referenced in her own summary judgment motion. *See* Dkt. 29 at 16:20–24. But Smith made numerous other complaints about her rights to reinstatement being denied. The adverse actions that followed can be attributed to Smith's opposition to the violation of her FMLA rights.

Beck Chase Gilman PLLC
705 S. Ninth St., Suite 305
Tacoma, WA 98405
253.289.5104

multiple purposes, both legitimate and illegitimate, when making employment decisions and still be liable under the WLAD." *Id.* Substantial evidence supports pretext, here.

An explanation that is unworthy of belief is evidence of pretext. *E.g.*, *id.* at 447; *Guyton v. Novo Nordisk, Inc.*, 151 F. Supp. 3d 1057, 1078 (C.D. Cal. 2015) ("inference of dissembling may arise where the employer has given shifting, contradictory, implausible, uninformed, or factually baseless justifications for its actions"). Here, the District's claim that Smith was merely caught up in a long-planned "reorganization" is not believable.

Before her injury, Banner **(1)** told Smith that he wanted her as his second-in-command; **(2)** moved her into the physical office that he occupied when he was Deputy, and which was historically occupied by the Deputy; **(3)** gave her "oversight and responsibility for most of the departments and programs" that "[h]istorically" belonged to the Deputy; **(4)** told Smith that he intended to eventually give her the official Deputy Superintendent title; and **(5)** told Smith that he did not trust Laubach—who had just gone against him for Superintendent—and "could not wait to see the look" on Laubach's face when Smith received Deputy duties. *See* § I.A., *spura.* The claimed "reorganization" **(6)** did not change the number of administrators employed in the District's central administration; **(7)** was not in response to an increase or reduction in the number of administrative functions; **(8)** was not in response to any budgetary concerns or need for a reduction in force; **(9)** did not result in financial savings; and **(10)** in fact *cost* the District more money. *See* Dkt. 22 at 4:21–24. While the District acknowledges that its various administrative functions and job titles shuffle from year to year, **(11)** Smith was the *only* person who suffered any negative impact from the 2020 "reorganization." *Id.* at 5:15–16. While the District argues that "[s]uch reorganizations and reassignments are common at the District" (Dkt. 29 at 20:3), **(12)** what happened to Smith is unprecedented—the District cannot identify a single other instance where an administrator at the Director level or above was demoted by one level, let alone two, for reasons unrelated to performance or discipline. *See id.* at 5:4–9; *Hilde v. City of Eveleth*, 777 F.3d 998, 1007 (8th Cir. 2015) ("An employer's failure to follow its own



policies may support an inference of pretext when the departure affects only [the plaintiff ].") (internal quotes omitted).

Banner claims **(13)** he only considered Laubach for Deputy and wanted to use his first year to "test drive" him. Yet, Banner **(14)** never told anyone about this, **(15)** including Laubach himself. Ex. B (Banner 30(b)(6) at 113:25–114:4); Ex. P (Laubach Dep. at 27:11–14, 35:22–36:23). The District's **(16)** own expert testified that it would not be reasonable to keep this information secret. Ex. E (Santorno Dep. at 93:15-94:25); *see also EEOC v. Metal Serv. Co.,* 892 F.2d 341, 350 (3d Cir.1990) ("informal, secretive and subjective hiring practices are suspect because they tend to facilitate the consideration of impermissible criteria."). Moreover, the District does not explain why in supposedly "test driv[ing]" Laubach, Banner **(17)** did *not* give Laubach responsibility for most of the departments and programs historically overseen by the Deputy.

While the District says Deputy has "historically been an important District position," (Dkt. 29 at 4:23) and that it wanted a Deputy in case the superintendent became incapacitated (*i.e.,* "hit by a bus"), it **(18)** does not explain why it was any less important to have a "clear second in command" during the 2019–2020 school year. *See* Ex. B (Banner 30(b)(6) at 111:9–16. Nor does the District **(19)** explain why, in the event of Superintendent Banner's incapacitation, Smith, Laubach, or both Smith and Laubach together could not fulfill his duties, even without the *title* of Deputy. Banner says he knew Laubach had Deputy qualifications from the outset but did not immediately name Laubach Deputy, because he wanted to test their working relationship—which **(20)** would not matter if Banner were "hit by a bus." *See id.* at 102:13–104:14. Given the purported importance of the Deputy role, Banner was asked why he did not just name Laubach the interim Deputy from the outset, knowing that he could nonrenew his contract the following year if there were issues. Banner testified: "I don't believe that I would want to start like that . . . . [I]t doesn't sound like a way to start." *Id.* at 112:3–22. Yet **(21)** Banner had no issue naming Smith to a high-level administrative position—one bearing a striking resemblance to Deputy Superintendent—only to eliminate her within the year. *Id.* at 112:23–113:24.



Beck Chase Gilman PLLC
705 S. Ninth St., Suite 305
Tacoma, WA 98405
253.289.5104

The District has also been dishonest. For example, when Banner met with Smith to tell her that her position was being eliminated, he **(22)** told her the Board directed him to reinstate the Deputy position "as a condition of [his] acceptance of the superintendent position." *Id.* at 118:11–119:13. That is not true. Ex. Q (Wagemann Dep. at 75:16–19); Ex. R (Schafer Dep. at 51:1–7). The District also said Smith was never considered for Deputy because she "lacked the superintendent credentials she *needed* to serve as backup to the Superintendent." Dkt. 32 at 3:10–11 (emphasis added). This **(23)** is not true. Ex. P (Laubach Dep. at 41:6–14). Nor is **(24)** the claim that Banner became Deputy *"[a]fter"* earning Superintendent credentials. *See* n.4, *supra*.

After Smith's position was "eliminated," **(25)** she was moved out of the physical Deputy's office and **(26)** Laubach moved into that physical office upon becoming Deputy. Dkt. 23 at 218.

Before her injury, Smith received several promotions, each by appointment, including from Banner. Ex. I. This treatment ceased after her injury. For example, **(27)** Banner did not appoint Smith to the lateral Assistant Superintendent of position vacated by Laubach, instead demoting her to Director after specifically terlling her there were no other suitable positions (despite knowing Laubach's promotion would create a vacancy). Ex. B (Banner 30(b)(6) at 161:2–4). After the individual hired into Laubach's former position was unsuccessful and resigned, Smith asked Banner to appoint her to the position. Again, **(28)** Banner did not exercise his discretion to appoint Smith, opting to post the position for a competitive hiring process. Smith Decl., Ex. C.

Pretext can be inferred from the timing of an adverse employment action. *Miller v. Fairchild Indus., Inc.*, 885 F.2d 498, 505 (9th Cir. 1989). Here, Smith was steadily rising through the District's ranks. The **(cc)** first written document indicating a change to Smith's trajectory was a note Banner stuck to her doctor's note—"Change in Duties—S.S."—*the same day* the District received it. Dkt. 23 at 234. By the time **(29)** Banner met with Smith on January 6, 2020—her *very first day* back from leave—he had already decided to eliminate her position. *See* Dkt. 22 at 7:2–11.

An employer cannot keep a case from the jury by relying on subjective criteria, like arguing that "other candidates were clearly qualified" or the "best fit" for a position. *Scrivener*, 181



Beck Chase Gilman PLLC
705 S. Ninth St., Suite 305
Tacoma, WA 98405
253.289.5104

Wn.2d at 448 (explanations were "ambiguous" and "vague"); *see also Chambers v. Metro. Prop. & Cas. Ins. Co.*, 351 F.3d 848, 858 (8th Cir. 2003) ("We have cautioned against the use of subjective considerations because they are easily fabricated."). Here, the District **(30)** only offers that Banner "*felt* like there needed to be more consistency of schedule," and that he "*felt* like the department needed more than three days a week." Ex. B (Banner 30(b)(6) at 40:6–14 (emphasis added). It **(31)** does not claim or offer evidence that Teaching and Learning *could not* function with shared oversight while Smith completed her recovery,[13] only that it preferred not to.

Repeated insistence that "Laubach was the obvious choice for Deputy" (Dkt. 29 at 7:9) does not account for the fact that **(32)** Laubach had already failed in the Deputy position before when a prior superintendent demoted him for poor performance. Ex. F. The District cites Laubach's years of experience, but **(33)** that plainly is not a determinative factor as Banner had less experience that Laubach (*see* Dkt. 23 at 219–20) yet was named both Deputy Superintendent and Superintendent over Laubach. Moreover, **(34)** Banner "considered nobody else" (Dkt. 29 at 7:21), supposedly not even Smith, thus affording even less weight to his subjective assessment.

A decisionmaker's "exasperation, lack of sympathy, and even animosity toward [the plaintiff]" supports an inference of improper motive. *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1286 (9th Cir. 2001). Also, a "general atmosphere" of hostility toward a protected group is "quite probative of whether decisionmakers felt free to take [the protected characteristic] into account when making employment decisions." *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 111–12 (3rd Cir 1999). Here, **(35)** Banner himself exhibited hostility and frigidness toward Smith following her injury. *E.g.*, Ex. A (Smith Dep. at 110:7–12). Moreover, **(36)** Smith observed Banner's discontent toward others who exercised their own medical leave

---

[13] Such an argument would amount to an "undue burden" affirmative defense, which the District has not pled and therefore waived. *Banga v. Kanios*, 16-CV-04270-RS, 2018 WL 11360187, at *2 (N.D. Cal. Mar. 20, 2018) (argument that accommodation would pose "undue hardship . . . has been characterized as an affirmative defense."). Even if the District had pled undue hardship, "[h]ypothetical or merely conceivable hardships cannot support a claim of undue hardship." *U.S. E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 5:10-CV-03911-EJD, 2013 WL 1435290, at *14 (N.D. Cal. Apr. 9, 2013). "[A]n employer raising an undue hardship defense [must] prove not just the fact of hardship, but also its magnitude—one that surpasses at least a *de minimus* level." *Id.* at *15 (dismissing affirmative defense where employer was "unable to furnish any evidence outlining the degree to which" employment policy affected performance).

BECK CHASE GILMAN PLLC
705 S. Ninth St., Suite 305
Tacoma, WA 98405
253.289.5104

rights. Ex. A (Smith Dep. at 229:16–230:10 (mocking employees with health issues as wanting "COVID-cation").

Pretext can also be shown by the inconsistent application of employer policy. *Cohen v. Fred Meyer, Inc.,* 686 F.2d 793, 797 (9th Cir. 1982). The District acknowledges, consistent with the WLAD, that it must engage in an "interactive process" to accommodate a disabled employee and that it *cannot* unilaterally impose an accommodation on an employee. *See* Dkt. 33 at 7:2–10; Ex. C (Davis 30(b)(6) at 27:19–29:8). Yet **(37)** Banner removed Smith's duties "to accommodate her needs" without any request from Smith or interactive process. Ex. B (Banner 30(b)(6) at 40:15–24); Ex. C (Davis 30(b)(6) at 43:20–44:22). Relatedly, **(38)** the District's repeated failure to investigate potential discrimination against Smith, consistent with its own policies, shows the District had improper motives. *See* § I.B., *surpa*. In contrast, **(39)** Banner's direction to have *Holly Shaffer* "investigated" for merely *observing* that Banner and the administration were making it difficult for Smith to succeed raises an inference that the District was trying to conceal its improper motives through "intimidation." *See* § I.C., *supra*.

**5. The Court should disregard inapplicable legal theories and inadmissible evidence.**

The "same actor inference" only applies "'where *the same actor* is responsible for both the hiring and the firing of *a discrimination plaintiff*, and both actions occur within a short period of time[.]'" *Johnson v. Express Rent & Own, Inc.*, 113 Wn. App. 858, 860–61, 56 P.3d 567 (2002) (quoting *Bradley v. Harcourt, Brace & Co.,* 104 F.3d 267 (9th Cir. 1996)) (emphasis added). Here, Banner did not hire Smith, who started in 2014. And even if one considered the issue from the time that Banner promoted Smith, ***Smith was not disabled*** when he made that decision.

Still, the District says the inference applies because "Banner did not discriminate *against others*." Dkt. 29 at 20:18 (emphasis added). But those "others" are not the "discrimination plaintiff." Moreover, evidence that Banner did not discriminate against "others" is both mischaracterized and improper.[14] The *only* other person that the District points to is Susan

---

[14] Courts "may only consider admissible evidence when reviewing a motion for summary judgment[.]" *Weil*, 922 F.3d at 998.



BECK CHASE GILMAN PLLC
705 S. Ninth St., Suite 305
Tacoma, WA 98405
253.289.5104

Kontos, who testified that she took intermittent leave over a period of six to eight weeks "in the summer of 2019" to care for her husband who was critically ill. Dkt. 31-1 at 137–38.

Regardless, one cannot contend that they complied with the law by pointing to other occasions where they did not violate the law. FED. R. EVID. 401–04. This is the equivalent of contesting a traffic ticket by pointing to other times when the defendant drove the speed limit.

Even if a defendant employer could use "comparator" evidence, Kontos is an insufficient comparator. Where an *employee* relies on comparators, she must show they are "similarly situated . . . in all material respects." *Weil*, 922 F.3d at 1004. Likewise, where an *employee* relies on statistics, "small samples have little predictive value and must be disregarded." *Freyd v. Univ. of Oregon*, 990 F.3d 1211, 1225 (9th Cir. 2021) (internal quotes omitted)). Here, Kontos is a sample of one and is not similarly situated to Smith in all materials respects. Kontos is a Director, which is two rungs below Assistant Superintendent. Kontos took leave during summer; Smith's was during the school year. Kontos took leave to care for someone else; Smith to recover herself. And Kontos was able to work intermittently while Smith could not work at all due to her injuries. Evidence of how the District may have treated a single other employee, in a different position, and under different circumstances, would not be admissible at trial and should not be considered here. Even if it were considered, it does not entitle the District to summary judgment.

### III. CONCLUSION

Nonexistent defenses and disregard of disputed facts do not support summary judgment. Respectfully submitted November 14, 2022.

BECK CHASE GILMAN PLLC

By: /s/ Eric D. Gilman
James W. Beck, WSBA No. 34208
james@bcglawyers.com | D 253.289.5122
Eric D. Gilman, WSBA No. 41680
eric@bcglawyers.com | D 253.289.5108
Janelle E. Chase Fazio, WSBA No. 51254
janelle@bcglawyers.com | D 253.289.5136
Attorneys for Plaintiff Kristi Smith

BECK CHASE GILMAN PLLC
705 S. Ninth St., Suite 305
Tacoma, WA 98405
253.289.5104

# CERTIFICATE OF SERVICE

I certify that on November 14, 2022 in Tacoma, Washington, I caused the attached **Plaintiff's Opposition to Defendant Clover Park School District No. 400's Summary Judgment Motion** along with the supporting Declarations of Eric D. Gilman, Kristi Smith, and Holly Shaffer, and Plaintiff's proposed order to be served as follows:

| | Via: |
|---|---|
| Mark F. O'Donnell<br>Preg O'Donnell & Gillett PLLC<br>901 Fifth Avenue, Suite 3400<br>Seattle, WA 98164<br>modonnell@pregodonnell.com<br>Attorneys for Defendant Clover Park School<br>District No. 400 | ☐ Messenger<br>☐ First Class U.S. Mail<br>☒ Electronic CM/ECF Notification<br>☒ Email per e-service agreement<br>☐ _____ |

/s/ Eric D. Gilman
Eric D. Gilman
BECK CHASE GILMAN PLLC



BECK CHASE GILMAN PLLC
705 S. Ninth St., Suite 305
Tacoma, WA 98405
253.289.5104