THE HON. JOHN H. CHUN

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

UNITED STATES DISTRICT COURT,
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KRISTI SMITH,

                          Plaintiff,

         v.

CLOVER PARK SCHOOL DISTRICT NO.
400,

                          Defendants.

No. 3:21-cv-05767-JHC

JOINT PRETRIAL ORDER

## I.     JURISDICTION

Jurisdiction is vested in this court by virtue of 28 U.S.C. § 1331 based on Plaintiff's claims of

violations of the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq*. The Court has

supplemental jurisdiction over Plaintiff's related state law claims under 28 U.S.C. § 1367.

## II.     CLAIMS AND DEFENSES

A. **Plaintiff** asserts that she will pursue at trial the following claims:

  1. Disability discrimination in violation of the Washington Law Against Discrimination

     ("WLAD"), RCW Ch. 49.60 *et seq*.

  2. Retaliation in violation of the WLAD, RCW Ch. 49.60 *et seq*.

  3. Violations of the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq*. ("FMLA"), for

     failing restore Smith to the position she held or an equivalent position after she took

     leave, and for taking one or more adverse employment actions against Smith because she

JOINT PRETRIAL ORDER– 1 of 24
(No. 3:21-cv-05767-JHC)

requested or took FMLA leave or opposed what she reasonably believed to be violations of the FMLA.

4. Violations of the Washington Family Leave Act, RCW Ch. 50A ("WFLA"), for failing restore Smith to the position she held or an equivalent position after she took leave, and for taking one or more adverse employment actions against Smith because she requested or took WFLA leave, or opposed what she reasonably believed to be violations of the WFLA.

5. Plaintiff also seeks injunctive relief under the WLAD, which, as equitable relief, will be decided by the Court as appropriate, following the jury's verdict. Plaintiff will also seek attorneys' fees and costs as the prevailing party as authorized by law, as well as exemplary or similar damages as authorized by law.

B. **Defendant** will pursue the following affirmative defenses:

1. Plaintiff has failed to mitigate her alleged damages.

## III.   ADMITTED FACTS

The following facts are admitted by the parties:

1. Plaintiff Kristi Smith ("Smith") is a Washington resident who lives and has lived in Kitsap County at all times relevant to this lawsuit.

2. Defendant Clover Park School District No. 400 ("CPSD" or "the District") is a municipal corporation located in Pierce County, Washington.

3. The District had more than 50 employees at all times relevant to this lawsuit.

4. Smith was hired by the District and began her employment July 1, 2014.

5. Smith's initial title with the District was Director for Teaching and Learning.

6. Effective July 1, 2017, Smith was promoted to Executive Director for Teaching and Learning.

7. Smith became a member of the Superintendent's Council beginning in the 2017–2018 school year and remained a member until July 1, 2020.

8. The District's Board named Ron Banner Superintendent during a School Board meeting on March 11, 2019. Mr. Banner officially assumed the role of Superintendent on July 1, 2019.

9. Historically, the District's Deputy Superintendent position included oversight and responsibility for most of the departments and programs Plaintiff oversaw during her one-year term as Assistant Superintendent for Instructional Programs.

10.  On September 16, 2021, Smith filed this lawsuit alleging violations of the WLAD.

11. Ron Banner's first year as Clover Park's Superintendent was in 2019-2020.

12. In March 2020, Mr. Banner appointed Mr. Laubach as Clover Park's Deputy Superintendent effective the next school year starting July 1, 2020.

IV.    ISSUES OF LAW

A. **By Plaintiff:** The Court has addressed many of the central issues of law in a comprehensive Order on the parties' respective summary judgment motions, and Plaintiff's motion to exclude certain expert testimony. *See* Dkt. 46. The issues for which the Court will oversee adjudication are as follows:

1. Did Defendant violate the WLAD, RCW Ch. 49.60 *et seq.* by discriminating or retaliating against Smith based on her disability, request for leave, taking of leave, request for reasonable accommodations, use of reasonable accommodations, or for opposing what Smith reasonably believed to be violations of the WLAD?

2.  Did Defendant violate the FMLA by failing restore Smith to the position she held or an equivalent position after she took leave, or by taking one or more adverse employment actions against Smith for taking FMLA leave or opposing what she reasonably believed to be violations of the FMLA?

3.  Did Defendant violate the WFLA by failing restore Smith to the position she held or an equivalent position after she took leave, or by taking one or more adverse employment actions against Smith for taking WFLA leave or opposing what she reasonably believed to be violations of the WFLA?

**B.  By Defendant**.

Issue 1: Did Defendant violate the WLAD, RCW Ch. 49.60 *et seq.*, by discriminating or retaliating against Plaintiff based on her temporary physical disability?

Issue 2: Did Defendant interfere with Plaintiff's FMLA rights under 29 U.S.C. § 2615(a)(1), and/or her the corresponding WFLA, rights by failing to restore Plaintiff to the same or an equivalent position upon her return from leave in January 2020?

**Defendant asserts that the following issues of law be added to those listed in Plaintiff's Pretrial Statement at Section IV.**

- Did Defendant lawfully transfer Plaintiff to a subordinate position under RCW 28A.405.230?

- Did Defendant lawfully take certain actions pursuant to statute, policy, contract or otherwise that Plaintiff now challenges including: swapping Plaintiff's Teaching and Learning oversight as an assistant superintendent with Student Services oversight from another assistant superintendent; transferring Plaintiff to a subordinate position under RCW 28A.405.230; and/or naming a different deputy superintendent instead of Plaintiff?

- Were the claimed discriminatory acts by the District a substantial factor in any decisions adversely effecting Plaintiff's employment?  The same actor defense applies to all actions complained about by Plaintiff.

- Has Plaintiff failed to mitigate her alleged damages?

- Has Plaintiff failed to demonstrate an entitlement for declaratory and other relief?

## V.     EXPERT WITNESSES

The name(s) and addresses of the expert witness(es) to be used by each party at the trial and the issue upon which each will testify is:

(1)     On behalf of plaintiff:

| NAME & ADDRESS | WILL TESTIFY OR POSSIBLE WITNESS ONLY | GENERAL NATURE OF EXPECTED TESTIMONY |
|---|---|---|
| Christina Tapia, Ph.D.<br>Northwest Economics<br>1416 NW 46th Street, Suite 105<br>Seattle, WA 98107 | Will testify. | Past and future economic damages suffered by Smith. Dr. Tapia is retained expert. |
| Judith A. Billings<br>Targeted Alliances<br>9821 74th Ave. E.<br>Puyallup, WA 98373-1249<br>(253) 840-4690 | Possible witness only. | Rebuttal of opinions of Carla Santorno. Ms. Billings is a retained expert. |
| Eric Lee, DO<br>The Doctors Clinic: Cavalon Place<br>2011 NW Myhre Rd. #203<br>Silverdale, WA 98383 | Possible witness only. | The nature, extent, and treatment of Smith's medical disability. |
| Maxine Mindel, CCC-SLP<br>11309 67th Ave. Ct. NW<br>Gig Harbor, WA 98332<br>(253) 857-3841<br>maxinemindel@comcast.net | Possible witness only. | The nature, extent, and treatment of Smith's medical disability. |

| NAME & ADDRESS | WILL TESTIFY OR POSSIBLE WITNESS ONLY | GENERAL NATURE OF EXPECTED TESTIMONY |
|---|---|---|
| Erin M. Dawson, MD<br>The Doctors Clinic<br>450 Kitsap Blvd., Suite 250<br>Port Orchard, WA 98366 | Possible witness only. | The nature, extent, and treatment of Smith's medical disability. |

(2) On behalf of defendant:

| NAME & ADDRESS | WILL TESTIFY OR POSSIBLE WITNESS ONLY | GENERAL NATURE OF EXPECTED TESTIMONY |
|---|---|---|
| Carla Santorno<br>c/o Preg O'Donnell & Gillett<br>901 Fifth Ave., Ste. 3400<br>Seattle, WA 98164-2026 | May testify. | Carla Santorno is expected to testify regarding whether the Superintendent acted within the standard of care and consistent with the District's policies and procedures and Washington Law with respect to Plaintiff's transfer of position. |
| William Partin, CPA, ABV, MAFF, CFE<br>c/o Preg O'Donnell & Gillett<br>901 Fifth Ave., Ste. 3400<br>Seattle, WA 98164-2026 | May testify. | William Partin is expected to rebut any opinions offered by plaintiff's forensic expert Tapia and/or other witnesses addressing any economic damages. Mr. Partin is expected to testify about alleged past and future economic loss. |

## VI.   OTHER WITNESSES

The names and addresses of witnesses, other than experts, to be used by each party at the time of trial and the general nature of the testimony of each are:

(a)   On behalf of plaintiff:

| NAME & ADDRESS | WILL TESTIFY OR POSSIBLE WITNESS ONLY | GENERAL NATURE OF EXPECTED TESTIMONY |
|---|---|---|
| Kristi Smith<br>c/o Beck Chase Gilman PLLC<br>705 S. Ninth St., Suite 305<br>Tacoma, WA 98405 | Will testify. | Plaintiff will testify as to her disability, abilities, reasonable accommodations, Defendant's wrongful conduct including acts of discrimination and retaliation, and damages. |
| Norm Smith<br>c/o Beck Chase Gilman PLLC<br>705 S. Ninth St., Suite 305<br>Tacoma, WA 98405 | Will testify. | Plaintiff's spouse will testify as to Plaintiff's disability, abilities, reasonable accommodations, Defendant's wrongful conduct including acts of discrimination and retaliation, and damages. |
| Ron Banner<br>c/o Preg O'Donnell & Gillett PLLC<br>901 Fifth Ave., Suite 3400<br>Seattle, WA 98164 | Will testify. | Knowledge of events giving rise to this case and Rule 30(b)(6) topics. |
| Karen Butler<br>8549 East Caraway Road<br>Port Orchard, WA 98366 | Possible witness only. | Knowledge of Plaintiff's abilities, disabilities, reasonable accommodations, and damages. |
| Greg Davis<br>c/o Preg O'Donnell & Gillett PLLC<br>901 Fifth Ave., Suite 3400<br>Seattle, WA 98164 | Will testify. | Knowledge of events giving rise to this case and Rule 30(b)(6) topics. |
| Aranka Holmes<br>c/o Preg O'Donnell & Gillett PLLC<br>901 Fifth Ave., Suite 3400<br>Seattle, WA 98164 | Possible witness only. | Knowledge of Defendant's response to Public Records Act requests related to Plaintiff. |
| Meghan Eakin<br>c/o Preg O'Donnell & Gillett PLLC<br>901 Fifth Ave., Suite 3400<br>Seattle, WA 98164 | Possible witness only. | Knowledge of events giving rise to this case, including in her capacity as one of Defendant's Executive Directors. |
| Carole Jacobs<br>c/o Preg O'Donnell & Gillett PLLC<br>901 Fifth Ave., Suite 3400<br>Seattle, WA 98164 | Possible witness only. | Knowledge of events giving rise to this case, including in her capacity as a member of Defendant's school board. |

| Name & Address | Will Testify or Possible Witness Only | General Nature of Expected Testimony |
|---|---|---|
| Linda Krininger<br>10334 West Salmonberry Road<br>Cheney, WA 99004<br><br>c/o Preg O'Donnell & Gillett PLLC<br>901 Fifth Ave., Suite 3400<br>Seattle, WA 98164 | Will testify. | Knowledge of events giving rise to this case, including in her capacity as Defendant's former Director of Human Resources. This witness resides in more than 100 miles from the courthouse. With the Court's permission, Plaintiff will seek to present this witness's testimony via Zoom. If that option is unavailable, then the witness will testify by deposition under Federal Rule of Civil Procedure 32(a)(4). |
| Brian Laubach<br>c/o Preg O'Donnell & Gillett PLLC<br>901 Fifth Ave., Suite 3400<br>Seattle, WA 98164<br>(253) 289-5104 | Possible witness only. | Knowledge of events giving rise to this case, including in his capacity as Deputy Superintendent or Assistant Superintendent for Defendant. |
| Tess McCartan<br>c/o Preg O'Donnell & Gillett PLLC<br>901 Fifth Ave., Suite 3400<br>Seattle, WA 98164 | Possible witness only. | Knowledge of events giving rise to this case, including in her capacity as one of Defendant's Executive Directors. |
| Lori McStay<br>c/o Preg O'Donnell & Gillett PLLC<br>901 Fifth Ave., Suite 3400<br>Seattle, WA 98164 | Will testify. | Knowledge of events giving rise to this case, including in her capacity as Defendant's Executive Director of Human Resources. |
| Dr. Brian Olsen<br>3114 Cheyenne St.<br>Tacoma, WA 97407 | Possible witness only. | Knowledge of Plaintiff's abilities, disabilities, reasonable accommodations, and damages. |
| James Martin "Marty" Schafer<br>c/o Preg O'Donnell & Gillett PLLC<br>901 Fifth Ave., Suite 3400<br>Seattle, WA 98164 | Possible witness only. | Knowledge of events giving rise to this case, including in his capacity as a former member of Defendant's school board. |

| NAME & ADDRESS | WILL TESTIFY OR POSSIBLE WITNESS ONLY | GENERAL NATURE OF EXPECTED TESTIMONY |
|---|---|---|
| Holly Shaffer<br>8717 153rd Street East<br>Puyallup, WA 98375 | Will testify. | Knowledge of Defendant's wrongful conduct including acts of discrimination and retaliation, and damages. |
| Paul Wagemann<br>c/o Preg O'Donnell & Gillett PLLC<br>901 Fifth Ave., Suite 3400<br>Seattle, WA 98164 | Possible witness only. | Knowledge of events giving rise to this case, including in his capacity as a member of Defendant's school board. |

       (b)     On behalf of defendant:

| NAME & ADDRESS | WILL TESTIFY OR POSSIBLE WITNESS ONLY | GENERAL NATURE OF EXPECTED TESTIMONY |
|---|---|---|
| Kristi Smith<br>c/o Beck Chase Gilman PLLC<br>705 S. Ninth St., Suite 305<br>Tacoma, WA 98405 | Will testify. | Plaintiff will testify regarding her knowledge of facts pertaining to the claims, defenses, and alleged damages at issue in this lawsuit. |
| Ron Banner<br>c/o Preg O'Donnell & Gillett PLLC<br>901 Fifth Ave., Suite 3400<br>Seattle, WA 98164 | Will testify. | Ron Banner will testify regarding his knowledge of facts pertaining to the claims, defenses, and alleged damages at issue in this lawsuit. |
| Lori McStay<br>c/o Preg O'Donnell & Gillett PLLC<br>901 Fifth Ave., Suite 3400<br>Seattle, WA 98164 | Will testify. | Lori McStay will testify regarding her knowledge of facts pertaining to the claims, defenses, and alleged damages at issue in this lawsuit. |
| Brian Laubach<br>c/o Preg O'Donnell & Gillett PLLC<br>901 Fifth Ave., Suite 3400<br>Seattle, WA 98164<br>(253) 289-5104 | Will testify. | Brian Laubach will testify regarding his knowledge of facts pertaining to the claims, defenses, and alleged damages at issue in this lawsuit. |

| NAME & ADDRESS | WILL TESTIFY OR POSSIBLE WITNESS ONLY | GENERAL NATURE OF EXPECTED TESTIMONY |
|---|---|---|
| James Martin "Marty" Schafer<br>To Be Supplemented | Will testify. | Marty Schafer will testify regarding his knowledge of facts pertaining to the claims, defenses, and alleged damages at issue in this lawsuit. |
| Carole Jacobs<br>To Be Supplemented | Will testify. | Carole Jacobs will testify regarding her knowledge of facts pertaining to the claims, defenses, and alleged damages at issue in this lawsuit. |
| Tess McCartan<br>c/o Preg O'Donnell & Gillett PLLC<br>901 Fifth Ave., Suite 3400<br>Seattle, WA 98164 | May testify. | Tess McCartan will testify regarding her knowledge of facts pertaining to the claims, defenses, and alleged damages at issue in this lawsuit. |
| Meghan Eakin<br>c/o Preg O'Donnell & Gillett PLLC<br>901 Fifth Ave., Suite 3400<br>Seattle, WA 98164 | May testify. | Megan Eakin will testify regarding her knowledge of facts pertaining to the claims, defenses, and alleged damages at issue in this lawsuit. |
| Suzy Kontos<br>c/o Preg O'Donnell & Gillett PLLC<br>901 Fifth Ave., Suite 3400<br>Seattle, WA 98164 | May testify. | Suzy Kontos will testify regarding her knowledge of facts pertaining to the claims, defenses, and alleged damages at issue in this lawsuit. |
| Holli Bocchi<br>To Be Supplemented | May testify. | Holli Bocchi will testify regarding her knowledge of facts pertaining to the claims, defenses, and alleged damages at issue in this lawsuit. |
| Holly Shaffer<br>8717 153rd Street East<br>Puyallup, WA 98375 | May testify. | Holly Schaffer will testify regarding her knowledge of facts pertaining to the claims, defenses, and alleged damages at issue in this lawsuit. |
| Karen Butler<br>8549 East Caraway Road<br>Port Orchard, WA 98366 | May testify. | Karen Butler will testify regarding her knowledge of facts pertaining to the claims, defenses, and alleged damages at issue in this lawsuit. |

| NAME & ADDRESS | WILL TESTIFY OR POSSIBLE WITNESS ONLY | GENERAL NATURE OF EXPECTED TESTIMONY |
|---|---|---|
| Linda Krininger c/o Preg O'Donnell & Gillett PLLC 901 Fifth Ave., Suite 3400 Seattle, WA 98164 | May testify. | Linda Krininger will testify regarding her knowledge of facts pertaining to the claims, defenses, and alleged damages at issue in this lawsuit. |
| Greg Davis c/o Preg O'Donnell & Gillett PLLC 901 Fifth Ave., Suite 3400 Seattle, WA 98164 | May testify. | Greg Davis will testify regarding her knowledge of facts pertaining to the claims, defenses, and alleged damages at issue in this lawsuit. |
| Record Custodians | May testify. | In the event authentication is contested at time of trial, Defendant reserves the right to call any and all record custodians for authentication of records. Defendant reserves the right to add to the final pretrial order any witnesses identified in discovery, initial disclosures or in depositions, or as necessary to address objections to authenticity or admissibility of evidence by the defense. |

## VII.   EXHIBITS

| PLAINTIFF'S EXHIBITS | | | | | |
|---|---|---|---|---|---|
| EX. # | DESCRIPTION | AUTHENTICITY | ADMISSIBILITY | OBJECTION | ADMITTED |
| 001 | Smith letter to McStay dated Sept. 6, 2019 | Disputed | Disputed | FRE 106, 401-403, 602, 701, 801-802, 805, 901, 1000-1004. | |
| 002 | Smith email to Banner and McStay dated Sept. 6, 2019 | Stipulated | Disputed | FRE 106, 401-403, 602, 701, 801-802, 805. | |
| 003 | December 18, 2019 Action Log with Doctor's Note | Disputed | Disputed | FRE 106, 401-403, 901. Objections handwritten notes on pages 1 and 2 only. | |

| | PLAINTIFF'S EXHIBITS | | | | |
|---|---|---|---|---|---|
| Ex. # | DESCRIPTION | AUTHENTICITY | ADMISSIBILITY | OBJECTION | ADMITTED |
| 004 | Laubach email to Banner with subject: "Org Chart – Brian" dated Jan. 6, 2020 | Disputed | Disputed | FRE 106, 401-403, 901. | |
| 005 | Smith Action Logs and notes | Disputed | Disputed | FRE 106, 401-403, 901. | |
| 006 | Board Briefs Memo from Banner to Board dated Jan. 24, 2020 | Stipulated | Stipulated | | |
| 007 | Notes and "Reorg Talking Points" dated Mar. 10, 2020 | Stipulated | Stipulated | | |
| 008 | Banner email to School Board with subject "Leadership Change and Additions," dated Mar. 16, 2020 | Stipulated | Stipulated | | |
| 009 | Banner email to ALT with subject "Superintendent Re-Organization …." Dated Mar. 16, 2020 | Stipulated | Stipulated | | |
| 010 | LeBeau letter to Laubach dated Nov. 30, 2016 | Disputed | Disputed | FRE 106, 401-404, 801-802, 805 | |
| 011 | Central Office Leadership Observation dated June 30, 2017 | Disputed | Disputed | FRE 106, 401-404, 801-802, 805. | |
| 012 | Job Posting for Deputy Superintendent with Mar. 16, 2020 Start Date | Stipulated | Stipulated | | |
| 013 | Banner and McStay emails re salary dated Mar. 19, 2020 | Stipulated | Stipulated | | |
| 014 | Krininger notes dated April 16, 2020 | Disputed | Disputed | FRE 106, 401-403, 602, 701, | |

| | | | | PLAINTIFF'S EXHIBITS | |
|---|---|---|---|---|---|
| Ex. # | DESCRIPTION | AUTHENTICITY | ADMISSIBILITY | OBJECTION | ADMITTED |
| | | | | 801-802, 805, 901. | |
| 015 | Krininger notes re: Concern email | Disputed | Disputed | FRE 106, 401-403, 602, 701, 801-802, 805, 901. | |
| 016 | Banner and Smith Emails regarding Assistant Superintendent for Secondary Schools position, dated May 3, 2022 | Stipulated | Disputed | FRE 401-403. | |
| 017 | Letter of Intent to Hire dated Mar. 11, 2014 | Stipulated | Disputed | FRE 401-403 | |
| 018 | 90-Day evaluation dated Sept. 26, 2014 | Stipulated | Disputed | FRE 401-403, 602 | |
| 019 | Annual evaluation dated June 30, 2015 | Stipulated | Disputed | FRE 401-403, 602 | |
| 020 | Annual evaluation dated June 30, 2016 | Stipulated | Disputed | FRE 401-403, 602 | |
| 021 | Annual evaluation dated June 21, 2017 | Stipulated | Disputed | FRE 401-403, 602 | |
| 022 | Annual Performance Appraisal dated June 28, 2018 | Stipulated | Disputed | FRE 401-403, 602 | |
| 023 | 90-Day Performance Evaluation dated Sept. 28, 2018 | Stipulated | Disputed | FRE 401-403, 602 | |
| 024 | Board Minutes dated Mar. 11, 2019 | Stipulated | Disputed | FRE 401-403 | |
| 025 | Superintendent's Contract dated Mar. 11, 2019 | Stipulated | Disputed | FRE 106, 401-403, 602 | |
| 026 | Annual Performance Appraisal dated June 12, 2019 | Stipulated | Disputed | FRE 401-403, 602. | |

| Ex. # | DESCRIPTION | AUTHENTICITY | ADMISSIBILITY | OBJECTION | ADMITTED |
|---|---|---|---|---|---|
| | PLAINTIFF'S EXHIBITS | | | | |
| 027 | CPSD Org Chart for workflows (Excel) dated June 24, 2019 | Stipulated | Stipulated | | |
| 028 | Note from CHI Franciscan dated Aug. 6, 2019 | Stipulated | Disputed | FRE 106, 901 | |
| 029 | Letter from Dr. Dawson dated Aug. 13, 2019 | Stipulated | Disputed | FRE 106, 901 | |
| 030 | Letter from Dr. Dawson dated Aug. 23, 2019 | Stipulated | Disputed | FRE 106, 901 | |
| 031 | Physician Certification dated Sept. 2, 2019 | Stipulated | Disputed | FRE 106, 901, | |
| 032 | Physician Certification dated Sept. 12, 2019 | Stipulated | Disputed | FRE 106, 901 | |
| 033 | Letter from Dr. Dawson dated Oct. 3, 2019 | Stipulated | Disputed | FRE 106, 901 | |
| 034 | FMLA Leave Authorization dated Oct. 4, 2019 | Stipulated | Stipulated | | |
| 035 | Letter from Dr. Dawson dated Nov. 5, 2019 | Stipulated | Disputed | FRE 106, 901 | |
| 036 | Dec. 18, 2019 transmittal of Doctor's release to return to work | Stipulated | Stipulated | | |
| 037 | Accommodations request form dated Dec. 19, 2019 | Stipulated | Stipulated | | |
| 038 | McStay notes dated Mar. 12, 2020 | Disputed | Disputed | FRE 106, 401-403, 602, 901 | |

| Ex. # | Description | Authenticity | Admissibility | Objection | Admitted |
|---|---|---|---|---|---|
| | PLAINTIFF'S EXHIBITS | | | | |
| 039 | Letter from Dr. Dawson dated Mar. 26, 2020 | Stipulated | Stipulated | | |
| 040 | Smith and McStay emails with subject: "Concern" dated April 19 to 29, 2020 | Disputed | Disputed | FRE 106, 401-403, 602, 901 | |
| 041 | Shaffer complaint emails dated May 10, 2020 | Disputed | Disputed | FRE 401-404, 602, 608, 801-805 | |
| 042 | McStay "Step II" response to Shaffer dated May 28, 2020 | Disputed | Disputed | FRE 401-404, 602, 608, 801-805 | |
| 043 | Shaffer email to McStay dated May 28, 2020 | Disputed | Disputed | FRE 401-404, 602, 608, 801-805 | |
| 044 | Annual Performance Appraisal dated June 8, 2020 | Disputed | Disputed | | |
| 045 | HRC charge sent June 22, 2020 | Disputed | Disputed | FRE 401-403 | |
| 046 | Smith complaint about work environment dated Oct. 6, 2020 | Disputed | Disputed | FRE 106, 401-403, 602, 901 | |
| 047 | Laubach reference letter dated Apr. 20, 2021 | Stipulated | Stipulated | | |
| 048 | Annual Summative Evaluation dated June 28, 2021 | Stipulated | Stipulated | | |
| 049 | Complaint for Damages filed in Pierce County Superior Court on Sept. 16, 2021 | Stipulated | Disputed | FRE 401-403 | |
| 050 | HRC closure notice dated Oct. 29, 2021 | Disputed | Disputed | FRE 401-403 | |

| | PLAINTIFF'S EXHIBITS | | | | |
|---|---|---|---|---|---|
| EX. # | DESCRIPTION | AUTHENTICITY | ADMISSIBILITY | OBJECTION | ADMITTED |
| 051 | Annual Summative Evaluation dated June 28, 2022 | Stipulated | Stipulated | | |
| 052 | Job description - Deputy Superintendent | Stipulated | Stipulated | | |
| 053 | Job description – Director of Student Services | Stipulated | Stipulated | | |
| 054 | 2016-17 organization chart | Disputed | Disputed | FRE 401-403, | |
| 055 | 2017-18 organization chart | Disputed | Disputed | FRE 401-403, | |
| 056 | 2019-20 organization chart (Jan. 2020) | Stipulated | Stipulated | | |
| 057 | 2020-21 organization chart | Stipulated | Stipulated | | |
| 058 | Office assignments spreadsheet | Disputed | Disputed | FRE 401-403. Multiple Documents | |
| 059 | Evacuation Map | Stipulated | Stipulated | | |
| 060 | OSPI Role of the Civil Rights Coordinator | Disputed | Disputed | FRE 106, 401-403, 901. | |
| 061 | OSPI training slide | Disputed | Disputed | FRE 106, 401-403, 901. | |
| 062 | Smith contracts 2014–2022 | Stipulated | Stipulated | | |
| 063 | Salary schedules 2014–2022 | Stipulated | Stipulated | | |
| 064 | Report of Christina Tapia, Ph.D dated July 22, 2022 (for illustrative purposes and for use with the Court's permission to the extent it becomes necessary) | Stipulated | Disputed | FRE 401-403, 602, 701-703, 801-802, 901. | |

| | | | | | |
|---|---|---|---|---|---|
| PLAINTIFF'S EXHIBITS | | | | | |
| Ex. # | DESCRIPTION | AUTHENTICITY | ADMISSIBILITY | OBJECTION | ADMITTED |
| 065 | Supplemental Report of Christina Tapia, Ph.D dated November 11, 2022 (for illustrative purposes and for use with the Court's permission to the extent it becomes necessary) | Stipulated | Disputed | FRE 401-403, 602, 701-703, 801-802, 901. | |
| 066 | Report of Judith Billings dated August 22, 2022 (for illustrative purposes and for use with the Court's permission to the extent it becomes necessary) | Stipulated | Disputed | FRE 106, 401-403 | |
| 067 | CPSD's Responses to Requests for Admission (for illustrative purposes and for use with the Court's permission to the extent it becomes necessary) | Stipulated | Disputed | FRE 1-6. 401-403 | |
| 068 | CPSD's answers and objections to Smith's 1st Interrogatories and Requests for Production (for illustrative purposes and for use with the Court's permission to the extent it becomes necessary) | Stipulated | Disputed | FRE 106, 401-403 | |
| 069 | CPSD's First Supplemental answers and objections to Smith's 1st Interrogatories and Requests for Production (for illustrative purposes | Stipulated | Disputed | FRE 106, 401-403 | |

| PLAINTIFF'S EXHIBITS | | | | | |
|---|---|---|---|---|---|
| Ex. # | DESCRIPTION | AUTHENTICITY | ADMISSIBILITY | OBJECTION | ADMITTED |
| | and for use with the Court's permission to the extent it becomes necessary) | | | | |
| 070 | CPSD's Second Supplemental answers and objections to Smith's 1st Interrogatories and Requests for Production (for illustrative purposes and for use with the Court's permission to the extent it becomes necessary) | Stipulated | Disputed | FRE 106, 401-403 | |
| 071 | CPSD's Third Supplemental answers and objections to Smith's 1st Interrogatories and Requests for Production (for illustrative purposes and for use with the Court's permission to the extent it becomes necessary) | Stipulated | Disputed | FRE 106, 401-403 | |
| 072 | CPSD's answers and objections to Smith's 2nd Interrogatories and Requests for Production (for illustrative purposes and for use with the Court's permission to the extent it becomes necessary) | Stipulated | Disputed | FRE 106, 401-403 | |
| 073 | CPSD's first supplemental answers and objections to Smith's 2nd | Stipulated | Disputed | FRE 106, 401-403 | |

| PLAINTIFF'S EXHIBITS | | | | | |
|---|---|---|---|---|---|
| EX. # | DESCRIPTION | AUTHENTICITY | ADMISSIBILITY | OBJECTION | ADMITTED |
| | Interrogatories and Requests for Production (for illustrative purposes and for use with the Court's permission to the extent it becomes necessary) | | | | |
| 074 | CPSD's answers and objections to Smith's 3rd Interrogatories and Requests for Production (for illustrative purposes and for use with the Court's permission to the extent it becomes necessary) | Stipulated | Disputed | FRE 106, 401-403 | |
| 075 | Banner photo | Stipulated | Disputed | FRE 401-403 | |
| 076 | Laubach photo | Stipulated | Disputed | FRE 401-403 | |
| 077 | McCartan photo | Stipulated | Disputed | FRE 401-403 | |
| 078 | Eakins photo | Stipulated | Disputed | FRE 401-403 | |
| 079 | Schafer photo | Stipulated | Disputed | FRE 401-403 | |
| 080 | Wagemann photo | Stipulated | Disputed | FRE 401-403 | |
| 081 | Smith family photos | Stipulated | Disputed | FRE 401-403 | |

Plaintiff intends to present admitted exhibits in electronic format to jurors.

| DEFENDANT'S EXHIBITS | | | | | |
|---|---|---|---|---|---|
| EX. # | DESCRIPTION | AUTHENTICITY | ADMISSIBILITY | OBJECTION | ADMITTED |
| 500 | Letter by Ron Banner re: Transferring of Position with enclosures dated March 10, 2020 | Disputed | Disputed | FRE 106, 401-403; MIL No. 3 | |
| 501 | Board Brief Memo from Ron Banner to | Disputed | Disputed | FRE 106, 401-403 | |

| | | DEFENDANT'S EXHIBITS | | | |
|---|---|---|---|---|---|
| EX. # | DESCRIPTION | AUTHENTICITY | ADMISSIBILITY | OBJECTION | ADMITTED |
| | Board dated November 8, 2019 | | | | |
| 502 | CPSD's Assistant Superintendent for Instructional Programs Job Description | Disputed | Disputed | FRE 106, 401–403 | |
| 503 | Organizational Chart, Council Level Positions | Stipulated | Stipulated | | |
| 504 | Organizational Chart (2021-2022) | Stipulated | Stipulated | | |
| 505 | McStay's Notes dated March 12, 2020 | Stipulated | Disputed | D (see Ex. 38), FRE 106 | |
| 506 | Executive Summary of Carla Santorno dated July 20, 2022(for illustrative purposes and for use with the Court's permission to the extent it becomes necessary) | Stipulated | Disputed | MIL No. 4, FRE 401–04, 602, 801–803 | |
| 507 | Report of Mueller & Partin dated September 20, 2022(for illustrative purposes and for use with the Court's permission to the extent it becomes necessary) | Stipulated | Disputed | FRE 401–04, 602, 801–803 | |
| 508 | Plaintiff's Action Logs and Notes, March 3, 20 | Disputed | Disputed | MIL No. 12 | |
| 509 | CPSD Policy No. 5211 | Stipulated | Disputed | MIL No. 3 | |
| 510 | Calendar Meeting with Subject "Discuss Reorg (few minutes)," dated April 23, 2019 | Disputed | Disputed | MIL No. 14 | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

| DEFENDANT'S EXHIBITS | | | | | |
|---|---|---|---|---|---|
| EX. # | DESCRIPTION | AUTHENTICITY | ADMISSIBILITY | OBJECTION | ADMITTED |
| 511 | Banner Reference Letter dated April 19, 2021 | Stipulated | Disputed | FRE 401-03 | |
| 512 | Email from Krininger to Plaintiff with Subject "Employee Accommodation Plan," dated January 3, 2020 | Stipulated | Stipulated | | |
| 513 | Email from Krininger to Plaintiff with Subject "Updated Accommodation Plan," dated April 6, 2020 | Stipulated | Stipulated | | |
| 514 | Letter to Banner from McCartan and Eakin | Disputed | Disputed | MIL No. 2 | |
| 515 | FMLA Leave Authorization dated October 4, 2019 | Stipulated | Disputed | D (see Ex. 34) | |
| 516 | McStay email to Plaintiff with subject "Follow-up to complaint of 10-6-20," dated November 12, 2020 | Disputed | Disputed | FRE 106 | |
| 517 | O'Donnell email to Beck with subject "Smith/Kristi/Clover Park School District," dated November 4, 2020 | Stipulated | Disputed | MIL No. 13 | |
| 518 | RCW 28A.405.230 | Stipulated | Disputed | MIL No. 3 | |
| 519 | CPSD Policy No. 5254 | Stipulated | Disputed | MIL No. 3 | |
| 520 | Kristi Smith Text Messages | Disputed | Disputed | FRE 106, 401–403, 602, 801–803 | |

| DEFENDANT'S EXHIBITS | | | | | |
|---|---|---|---|---|---|
| EX. # | DESCRIPTION | AUTHENTICITY | ADMISSIBILITY | OBJECTION | ADMITTED |
| 521 | Superintendent Ron Banner's Biography | Disputed | Disputed | MIL No. 15, FRE 401-403, 801-803 | |
| 522 | CPSD Standard Operating Procedures | Disputed | Disputed | FRE 401-403; 801-803 | |
| 523 | CPSD Board of Directors Role and Responsibility | Disputed | Disputed | MIL No. 15; FRE 401-403; 801-803 | |
| 524 | Brian Laubach Evaluations 2019-20, 2020-21, 2021-22 | Disputed | Disputed | MIL No. 15 FRE 401-403; 801-803 | |
| 525 | CPSD's Job Description for Laubach's Assistant Superintendent Position 2020 | Stipulated | Stipulated | | |
| 526 | McCartan email to Laubach, Plaintiff, and Eakin sent on October 1, 2020 at 10:34 a.m. | Stipulated | Disputed | FRE 401-403; 801–803 | |
| 527 | List of Candidates for 2020 and 2022 (Provisional) | Disputed | Disputed | MIL No. 15; FRE 401-403; 801-803 | |
| 528 | Interviewer's Notes for Kristi Smith's Interview for Assistant Superintendent in 2022 (to be supplemented) | Disputed | Disputed | FRE 401-403; 801-803 | |

The Parties' Objection Code:

| MIL | Subject of Motion in Limine |
|---|---|

## VIII.   DEPOSITION DESIGNATIONS

Witness Linda Krininger retired from her role as the District's Director of Human

Resources. She now resides in Cheney in Eastern Washington. Plaintiff took Ms. Krininger's

deposition with the understanding that she was beyond the 100-mile reach of a trial subpoena. However, the District's counsel, who also represents Ms. Krininger, recently indicated that Ms. Krininger will make herself available to testify in-person at trial. As a precaution, the parties have nonetheless prepared deposition designations, counter-designations, objections, and responses, per LCR 16, related to Ms. Krininger's deposition. They are attached as **Appendix A**.

IX.    ACTION BY THE COURT

(a) This case is scheduled for trial before a jury on January 17, 2023, at 9:30 a.m.

(b) Trial briefs shall be submitted to the court on or before January 6, 2023.

(c) Jury instructions requested by either party shall be submitted to the court on or before January 6, 2023.  Suggested questions of either party to be asked of the jury by the court on voir dire shall be submitted to the court on or before January 6, 2023.

(d) All exhibits identified in this Pretrial Order for which authenticity and admissibility are stipulated should be admitted into evidence. Accordingly, it is hereby ordered that the following Trial Exhibits are admitted into evidence: 6, 7, 8 , 9, 12, 13, 27, 34, 36, 37, 39, 47, 48, 51, 52, 53, 56, 57, 59, 62, 63, 503, 504, 512, 513, and 525.

This order has been approved by the parties as evidenced by the signatures of their counsel.  This order shall control the subsequent course of the action unless modified by a subsequent order.  This order shall not be amended except by order of the court pursuant to agreement of the parties or to prevent manifest injustice.

Dated this 6th day of January 2023.

_John H. Chun_
Hon. John H. Chun
United States District Judge

1

FORM APPROVED

2

/s/ Eric D. Gilman_____
Attorney for Plaintiff

3

/s/ Mark O'Donnell_____
Attorney for Defendant

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

# Appendix A

1                IN THE UNITED STATES DISTRICT COURT

2           WESTERN DISTRICT OF WASHINGTON AT TACOMA
    _____
3
    KRISTI SMITH,                    )
4                                    )
                        Plaintiff,   )
5                                    )
            v.                       )    No. 3:21-cv-05767-JHC
6                                    )
    CLOVER PARK SCHOOL DISTRICT      )
7   NO. 400,                         )
                                     )
8                       Defendant.   )
    _____
9   _____

10             VERBATIM TRANSCRIPT OF PROCEEDINGS
           VIDEO CONFERENCE DEPOSITION OF LINDA KRININGER
11                      OCTOBER 3, 2022
    _____

12      **KEY:**
        Smith's Initial Designations
13
        District's Counter-Designations
14

15      Smith's Reply Designations

16

17      Defense Objections

18      Plaintiff's Responses

19

20

21  REPORTED BY:   Jessica L. Turner, CCR No. 3187
                    Nelson Court Reporters, Inc.
22                   6513 132nd Avenue NE, #184
                    Kirkland, Washington 98033
23              production@nelsonreporters.com
                    www.nelsonreporters.com
24

25  APPEARING REMOTELY FROM LEWIS COUNTY, WASHINGTON

Linda Krininger
10/3/2022

```
 1                    APPEARANCES

 2

 3   For Plaintiff:          ERIC D. GILMAN
                             Beck Chase Gilman PLLC
 4                           705 S Ninth Street, Suite 305
                             Tacoma, WA  98405
 5

 6   For Defendant:          JASON HARRINGTON
                             Preg O'Donnell & Gillett PLLC
 7                           901 Fifth Avenue, Suite 3400
                             Seattle, WA  98164
 8

 9   Also Present:          GREG DAVIS

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Linda Krininger
10/3/2022

```
1                      TABLE OF CONTENTS

2

3                         TESTIMONY

4                                                    Page

5    LINDA KRININGER

6       Examination by Mr. Gilman...................  4

7

8                          EXHIBITS

9                                              Page

10           110 - 01/03/2020 email            26

11           111 - 03/26/2020 letter           29

12           112 - handwritten notes           30

13           113 - 04/06/2020 email            30

14           114 - 07/08/2020 letter           32

15

16

17

18

19

20

21

22

23

24

25
```

Linda Krininger
10/3/2022

| | |
|---|---|
| 1 | (The following took place on October 3, 2022, |
| 2 | beginning at 11:31 p.m.:) |
| 3 | |
| 4 | LINDA KRININGER, having been first duly sworn upon oath |
| 5 | or affirmed, testified as follows: |
| 6 | |
| 7 | EXAMINATION |
| 8 | BY MR. GILMAN: |
| 9 | Q      Good morning, Ms. Krininger.  My name is Eric |
| 10 | Gilman.  And can you hear and see me okay? |
| 11 | A      I can. |
| 12 | Q      All right.  We're doing this deposition over Zoom |
| 13 | today.  Can you let us know for the record where you |
| 14 | are.  City and state? |
| 15 | A      Spokane Valley, Washington. |
| 16 | Q      And could you state and spell your name, please? |
| 17 | A      It's Linda.  L-I-N-D-A.  Krininger.  It's |
| 18 | K-R-I-N-I-N-G-E-R. |
| 19 | Q      And what is your current residential address? |
| 20 | A      10334 West Salmonberry -- one word -- Road, |
| 21 | Cheney, C-H-E-N-E-Y, 99004. |
| 22 | Q      Have you ever had your deposition taken? |
| 23 | A      I have not. |
| 24 | Q      All right.  Well, just a couple quick ground rules |
| 25 | here.  We will try to get through this as quickly as |

Linda Krininger
10/3/2022

 1      we can.

 2           First, we want to make sure we don't speak over

 3      one another to make sure the record is clear.

 4           Is that understood?

 5  A      Yes.

 6  Q      We want to make sure you have audible answers,

 7      meaning yeses or noes as opposed to nods of the head

 8      or "hmm-mm," "mm-mm," again, so the record is clear.

 9           Is that understood?

10  A      Yes.

11  Q      You are allowed to take breaks during the

12      deposition today.  Hopefully we won't be here long

13      enough for that to be necessary.  But that's entirely

14      acceptable.  The only caveat being is if there is a

15      question pending, we'd ask you to answer the question

16      before you move on.

17           Is that understood?

18  A      Yes.

19  Q      I'm going to try my best to ask clear questions.

20      If at any point I don't succeed, please ask me for

21      clarification rather than guessing what I'm getting

22      at; is that fair?

23  A      Yes.

24  Q      All right.  Likewise, if I ask a question and you

25      give an answer, we will assume in the aftermath that

Linda Krininger
10/3/2022

```
 1       you understood what was being asked.  Is that
 2       understood?
 3   A       Yes.
 4   Q       All right.  And just a moment ago, you were placed
 5       under oath.  Even though we are here on the computer,
 6       you understand that you have the same obligation to
 7       be truthful and accurate in your testimony as if you
 8       were sitting in a courtroom giving testimony?
 9   A       Yes.
10   Q       Have you done anything to prepare for today's
11       deposition?
12   A       Printed out my resume.  And got a good night
13       sleep.
14   Q       All right.  Good.  Good.  Did you speak with
15       anyone about today's deposition?
16   A       I told my boss because he had to be able to
17       approve that I could do this at work.
18   Q       All right.  You mentioned that you had your CV.
19       Maybe rather than me asking you to try to recite it
20       here, would you have any issue with sharing or
21       emailing that CV with us maybe after we're done here
22       today so that we will have it?
23   A       Absolutely, yes.
24   Q       And I assume everything on your CV is truthful and
25       accurate?
```

Linda Krininger
10/3/2022

```
 1   A      Yes.
 2   Q      When did you work for Clover Park School District?
 3   A      Did you want the start and end date?
 4   Q      Please.
 5   A      Okay.  I started January 8th, 2012, and my last
 6          day was August 13th, 2021.  I'm pretty sure those
 7          dates are accurate.
 8   Q      Were you always in the position of director of
 9          human resources during that period of time?
10   A      No.
11   Q      Can you give me a brief overview of how you moved
12          through the different roles you had?
13   A      Yep.  I started as HR specialist from January to I
14          believe June.  And then in July through I want to --
15          gosh.  When was that?  July of that same year for
16          about five years, I want to say, I was the HR
17          manager.
18   Q      Was the HR manager position different than the HR
19          director position, or was it a title difference that
20          might have shifted?
21   A      It was a position difference.
22   Q      And then what was your next position after HR
23          manager?
24   A      HR director.
25   Q      So that would have been I guess starting the 2017
```

Linda Krininger
10/3/2022

1      academic year?

2   A      Right.  Yes.

3   Q      And is that the highest position you achieved

4      while with Clover Park?

5   A      Yes.

6   Q      Were you always a report to Lori McStay?

7   A      Yes.

8   Q      Did you have any other supervisors during your

9      time at Clover Park?

10          MR. HARRINGTON:  Object to the form.

11          THE WITNESS:  No.

12  BY MR. GILMAN:

13  Q      And was the answer to that "no"?

14  A      Yes.

15  Q      Focusing in on your role as the HR director, can

16      you give just an overview of what your job functions

17      were?

18  A      As the HR director?

19  Q      Yes, ma'am.

20  A      Okay.  I had payroll reported to me, as well as

21      employment services.  And I dealt with staffing and

22      investigations and over the FMLA and workers' comp

23      stuff, day-to-day records, the public records

24      requests.

25  Q      Specific -- well, let me ask a separate question.

Linda Krininger
10/3/2022

```
 1         What kind of education or training do you have to
 2     serve as the HR director for a school district?
 3         MR. HARRINGTON:  Object to the form.
 4  BY MR. GILMAN:
 5  Q     You may answer.
 6  A     I have my bachelor's degree in human resource
 7     management, and I have my master's degree in
 8     management in leadership.
 9  Q     Prior to joining Clover Park, did you work with
10     other school districts or elsewhere?
11  A     I worked at South Kitsap School District.
12  Q     And how long did you work for South Kitsap?
13  A     I was there about five years.  No, seven years.
14  Q     Was your work at South Kitsap in an administrative
15     role or something else?
16  A     Yes, administrative.  Not administrator but
17     administrative.
18  Q     Did you know Kristi Smith when you worked at South
19     Kitsap?
20  A     I did.
21  Q     Can you -- how long have you known Kristi Smith?
22  A     A long time.  Probably since 2005.
23  Q     When you were at Clover Park early on, did you
24     suggest to anyone that they might reach out to
25     Ms. Smith about open positions at Clover Park?
```

Linda Krininger
10/3/2022

```
 1   A      Did I suggest that?

 2   Q      Yes.

 3   A      I did not.

 4   Q      Do you know anyone who did?

 5   A      That wasn't in my purview, so I can't answer that.

 6   Q      That's all right.  Thank you.

 7          Did you, during your time working with Ms. Smith

 8      either at South Kitsap or at Clover Park, did you

 9      generally have a professional or collegial

10      relationship with her?

11   A      Yes.

12   Q      Did you and Ms. Smith socialize or interact

13      outside of work?

14   A      A few times.

15   Q      So I recognize that it's been some years since

16      you've probably thought about the issues related to

17      the case that we're here to discuss today.  I'm going

18      to try to put up a few documents that -- but, you

19      know, see if you have seen them or not and hopefully

20      to orient yourself to the timeline.

21          First off, you understand that Ms. Smith had a

22      concussion or a head injury at home in August

23      of 2019?

24   A      Yes.

25   Q      And you also understand that she had to take FMLA
```

Linda Krininger
10/3/2022

| | | |
|---|---|---|
| 1 | | leave as a result of that injury? |
| 2 | A | Yes. |
| 3 | Q | I want to ask you specifically about a couple of |
| 4 | | changes related to that.  And first, if you want to |
| 5 | | give me a moment, I'm going to share my screen with |
| 6 | | you.  And I'm going to show you what was previously |
| 7 | | used in another deposition and marked as Exhibit 3. |
| 8 | | So that's what I'm going to refer to it as.  And let |
| 9 | | me know if you can see a document on your screen -- |
| 10 | A | Yes. |
| 11 | Q | -- entitled -- okay. |
| 12 | | Exhibit 3 is a board brief dated January 24th, |
| 13 | | 2020.  I want to draw your attention to this |
| 14 | | highlighted portion here, and I will also try to zoom |
| 15 | | in on it as well.  I guess the first question is have |
| 16 | | you ever seen this board brief prior to today? |
| 17 | A | I have not. |
| 18 | Q | Go ahead and read the highlighted paragraph that |
| 19 | | starts with "attached you will find." |
| 20 | A | Okay. |
| 21 | Q | So that paragraph, I'll paraphrase a bit, |
| 22 | | identifies shifting of responsibilities related to |
| 23 | | teaching and learning and student services.  Do you |
| 24 | | recall that change being made? |
| 25 | A | I do recall that change being made, yes. |

Linda Krininger
10/3/2022

```
 1   Q      And was this -- well, strike that.
 2          How did you first come to learn that there would
 3      be a shift like what's described here in Exhibit 3
 4      regarding responsibilities?
 5   A      My supervisor would have provided me that
 6      information.
 7   Q      And who would that have been?
 8   A      Lori McStay.
 9   Q      Do you recall whether you were aware that this
10      change was being made prior to January 24th, 2020?
11   A      I don't recall.
12   Q      And as far as Ms. McStay informing you of the
13      change, do you recall having any discussions with her
14      about it prior to January 24th of 2020?
15   A      I can speculate, but I don't think that's what we
16      want.
17   Q      Okay.  And I appreciate that.  I take your
18      response to mean you don't have a specific
19      recollection of a conversation with Ms. McStay about
20      this change?
21   A      That's correct.
22   Q      That said, you assume it would have been some
23      information that she would have provided to you in
24      the time frame that this change was occurring?
25   A      Yes.
```

13:12-14:2 | Def. Obj: duplicative, cumulative

Pl. Resp. | Authenticates Trial Ex. 9; lays witness foundation.

Linda Krininger
10/3/2022

1    Q       Other than potentially learning about this change

2           from Ms. McStay, did you personally have any

3           involvement in the district's decision to make the

4           change that's described in Exhibit 3 regarding

5           Ms. Smith's job duties?

6    A       I did not.

7    Q       Even informally, do you recall ever having

8           discussions with anybody else about this change

9           regarding Ms. Smith's duties prior to them being

10          enacted in January of 2020?

11   A       I do not recall that.

12   Q       I'm going to show you another document that was

13          previously marked as Exhibit 2.  And this is an email

14          from Mr. Banner to the Administrative Leadership Team

15          dated March 16th, 2020.  It's a couple-page exhibit.

16          And then my question is going to focus at least on

17          the top portion of this page.

18          Because we're on Zoom, if you want me to scroll

19          further, I'm happy to do that.  But I will give you a

20          chance to read at least the opening portion of that

21          email through "Thank you, Kristi and Brian."

22   A       Okay.

23   Q       Do you recall receiving this email or an email

24          with this substantive communication in it on or

25          around March 16th, 2020?

Linda Krininger
10/3/2022

1  A       I would have received that as part of ALT,

2         Administrative Leadership Team.

3  Q       Okay.  And were you yourself a member of the

4         Administrative Leadership Team?

5  A       Yes.

6  Q       Similar question, prior to receiving this

7         March 16th, 2020, email, did you have any knowledge

8         about the fact that Ms. Smith's position was going to

9         be eliminated?

10 A       Prior to March 16th?

11 Q       Right.  Before this email went out.

12 A       Yes, I did.

13 Q       Okay.  And can you tell me what you knew about the

14        changes that are described in Exhibit 2 prior to this

15        email being sent.

16 A       I was just notified -- one part of my position was

17        to take any staffing changes and be able to adapt any

18        work flows that we have for electronic approvals and

19        to prepare those ahead of time.  So I can't tell you

20        the exact date, but I can tell you I did know before

21        this went out.

22 Q       Okay.  Do you recall who informed you that the

23        change was happening?

24 A       That would be Ms. McStay.

25 Q       Okay.  Other than telling you that the change

15:11-24 Def. Obj. | speculative

Pl.'s Resp. | Witness is testifying to extent of personal knowledge.

Linda Krininger
10/3/2022

1      would be happening -- and I assume that you needed to

2      make some administrative adjustments to implement

3      that change -- did you discuss anything else about

4      this reorganization that is described in Exhibit 2

5      prior to March 16th?

6    A      I don't recall.

7    Q      Okay.  Do you recall anything else about the

8      conversation that you had with Ms. McStay when she

9      informed you that this reorganization was occurring?

10   A      I do not.

11   Q      Did you know prior to this email going out that

12     Mr. Brian Laubach was going to be appointed as the

13     deputy superintendent?

14   A      I did.

15   Q      And how soon before -- and I recognize that you

16     don't have an exact date.

17          Approximately how soon before this announcement

18     email went out do you think you knew about the change

19     that was being described?

20   A      I don't recall an exact time.

21   Q      And that's fair.  What I'm maybe trying to get at

22     is a time frame.  Was it a matter of months, days,

23     weeks?  Where would you put it?

24   A      Weeks.

25   Q      Okay.  Would you say more or less than two weeks

Linda Krininger
10/3/2022

| | | |
|---|---|---|
| 1 | | before March 16th that you knew about this change? |
| 2 | A | I really can't answer that.  I'm sorry.  I would |
| 3 | | just be guessing at this point. |
| 4 | Q | I appreciate that. |
| 5 | | Other than Ms. McStay informing you at some point |
| 6 | | prior to this March 16th email in Exhibit 2 that |
| 7 | | these changes were being made, did you have |
| 8 | | discussions with anybody else about this |
| 9 | | reorganization? |
| 10 | A | No. |
| 11 | Q | Were you involved in any way in the |
| 12 | | decision-making process related to this |
| 13 | | reorganization? |
| 14 | A | No. |
| 15 | Q | As part of your job duties as the director of |
| 16 | | human resources, did you attend school board |
| 17 | | meetings? |
| 18 | A | I did. |
| 19 | Q | And was that a requirement for you? |
| 20 | A | It was. |
| 21 | Q | Okay.  Did you ever hear any communications or |
| 22 | | participate in any communications about the school |
| 23 | | board's desire to have a deputy superintendent |
| 24 | | appointed by Mr. Banner? |
| 25 | A | I did not. |

Linda Krininger
10/3/2022

1    Q      Prior to learning sometime before this March 16th

2           email in Exhibit 2 about the reorganization, had you

3           heard any discussions about the fact that there might

4           be a reorganization?

5    A      Yes.

6    Q      And can you tell me what that was?

7    A      I recall being told that there's going to be some

8           changes:  That the assistant superintendent for

9           instructional programs was going away; and Kristi was

10          going to become the director of student services

11          because the current director was retiring; and that

12          Mr. Laubach was going to be the deputy

13          superintendent.

14   Q      And the information you just relayed, is that from

15          the conversation with Ms. McStay that you --

16   A      Yes.

17   Q      -- referred to earlier?

18   A      Yes.

19   Q      Thank you.

20          Other than that conversation with Ms. McStay, had

21          you been involved in any other communications about a

22          potential reorganization within the administration?

23   A      No.

24   Q      During the 2019-2020 academic year, did you ever

25          receive any information that Superintendent Banner

Linda Krininger
10/3/2022

```
 1        was considering any person to be his deputy
 2        superintendent?
 3   A       During the 2019 to 2020, I don't recall.  Those
 4        dates are not familiar to me.
 5   Q       Sure.  Maybe just, again, to reorient, that was --
 6        '19 to '20 was the first academic year in which
 7        Mr. Banner was the superintendent.  With that
 8        context, do you recall any discussions or
 9        communications that you were aware of during that
10        year about -- go ahead.
11   A       Well -- no, I didn't want to interrupt you.  I
12        apologize.
13           This communication right here.
14   Q       Sure.
15   A       Is the '19-'20 school year.
16   Q       Yes, ma'am.  And prior to the date of Exhibit 2
17        and the discussion you've mentioned with Ms. McStay
18        that that was at some point before this, were there
19        any other communications that you are aware of about
20        potential deputy superintendents for the district?
21   A       I don't recall.
22   Q       You mentioned a little earlier that part of the
23        reason you knew about this or maybe the reason you
24        knew about this change sometime before March 16th was
25        because you had to do some administrative work in the
```

Linda Krininger
10/3/2022

```
 1        district systems to make sure that work flows could
 2        occur; is that fair?
 3   A       Yes.
 4   Q       When Kristi Smith was named the assistant
 5        superintendent of instructional programs, did you
 6        have to make any kind of similar arrangements?
 7   A       Yes.
 8   Q       And what specifically, if you recall, would you
 9        have had to do when Ms. Smith came into that role?
10   A       Regarding the systems, it's you have to change the
11        work flows.  And so that's what I did with her.
12   Q       And can you maybe just help me understand what you
13        mean by change the work flows?
14   A       Mm-hmm.
15          So the work flows, they start in human resources.
16        And then they go up the chain as far as approval,
17        whether it's for a position -- or there is a couple
18        different systems.  Position changes, that type of
19        thing.
20          So it goes from HR to a supervisor of who is
21        requesting the change, whether it's a school.  And
22        then it would go -- if it went to a principal and
23        then it involved a department, then it would involve
24        Kristi, because she was -- was she -- I believe she
25        was elementary prior to that.
```

Linda Krininger
10/3/2022

20:1-23 Def. Obj. - ER 401-403, relevance,
speculative, relates only to uncertain,
unnamed general practice

```
 1   Q      One of the topics you mentioned when I asked about
 2          your job duties as HR director had to do with
 3          investigations.  What kinds of things did you do in
 4          relation to investigations?
 5   A      The administrator would call and let us know if
 6          there was a problem with the school with a staff.
 7          And we would determine if that had to be where HR
 8          needed to be involved or not.  And then just provide
 9          guidance and help them write their letters, outcomes.
10          If it was something that involved HR, then I would
11          go out there and conduct the investigation and work
12          with the administrator to -- with the outcome.
13          Involving the Union, of course, during the whole
14          process.
15   Q      And as far as any training you might have specific
16          to HR investigations, do you have any?
17   A      I did research online.  That, in that respect.  I
18          have talked to my peers about how they conducted
19          investigations, and then I even worked with some
20          attorneys in the past and what they were looking for
21          and making sure that we're adhering to policies and
22          collective bargaining agreements and laws, of course.
23          So that was my experience.
24   Q      And I understand that there might be some sources
25          that district HR departments look at.  I've heard
```

Pl. Resp. - Investigation practices of District's HR Director are relevant, including
where claim is that District ignored its own investigation requirements to retaliate
against Smith. See Dkt. 46 at 23:23–24:4 ("[W]hether the District . . . 'failed to
investigate potential discrimination in accordance with its own investigative
guidelines . . . or 'refus[ed] to impartially investigate Smith's October 2020
complaint of discrimination[]' are highly factual questions" for the jury).

20

Linda Krininger
10/3/2022

```
1        WSPA might have some publication.  Also OSPI might
2        have some publications.
3            Did you ever attend training or review any
4        publications from any outside entities?
5   A    From WSPA.  Was mostly WSPA.
6   Q    And what does that acronym, WSPA, stand for?
7   A    Washington School Personnel Association.
8   Q    Did you ever attend any trainings that were
9        communicating the OSPI's investigatory standards for
10       school districts?
11  A    I don't believe so.
12  Q    I'm going to show you another previously marked
13       exhibit.  This is No. 78.  And I'll let you take a
14       quick look at that.  This is another board brief.
15       It's just dated November 8th, 2019.
16           I'll ask you the same question is do you recall
17       actually ever seeing this board brief prior to today?
18  A    I did not read the board briefs.
19  Q    Fair enough.  Towards the bottom, there is a
20       highlighted section, again, about Kristi Smith.  And
21       what I wanted to ask you about specifically is on --
22       and I'm just going to the second page of the exhibit
23       so you can see the change here.
24           There is a sentence that states, "My next step is
25       to seek out a retired administrator to take on her
```

Linda Krininger
10/3/2022

1       supervisory duties pending the outcome of her medical

2       condition," end quote.  Do you see where it says

3       that?

4   A       Yes.

5   Q       And the question for you is, were you at all

6       involved in this portion of the process in

7       potentially seeking out a retired administrator?

8   A       No.

9   Q       Regardless of whether you were personally involved

10      in that process, do you have any information one way

11      or another about that search or attempt to find a

12      retired admin.?

13  A       I do not.

14  Q       Sorry.  To hop back, I forgot a question with

15      respect to the investigation aspect of your job.

16          Was there ever any discussion in your training or

17      just as a matter of practice for you about

18      documentation or making sure that there is records

19      kept when you conduct an investigation?

20  A       Yes.

21  Q       And when you would personally conduct an

22      investigation, did you generally keep contemporaneous

23      notes or reports related to what you were

24      investigating?

25  A       Yes.

Linda Krininger
10/3/2022

```
 1   Q       Was it your practice to do handwritten notes?
 2           Type them after the fact?  How did you personally do
 3           that?
 4   A       Most of the time I typed them as I was there.
 5           Some cases, I wrote them and then typed them.
 6   Q       And generally speaking, what is the significance
 7           of -- or strike that.
 8           Why did you take notes or keep typewritten notes
 9           of your investigations?
10   A       To go back and review to make sure that we were
11           taking the steps necessary or needed.
12   Q       And likewise, I imagine oftentimes when there is
13           an HR investigation involved, there is ultimately
14           some sort of a resolution of the dispute.  How is the
15           resolution typically documented for Clover Park
16           School District?
17   A       Through letter of expectation, letter of
18           direction, letter of reprimand, progressive
19           discipline.
20   Q       And I take it it's probably also possible there
21           might be a letter where there is no finding --
22   A       Yes.
23   Q       -- of impropriety?
24   A       Yes.
25   Q       And even in that situation, from HR's perspective,
```

Linda Krininger
10/3/2022

```
1        is it important to document the outcome of its
2        investigations?
3   A        Yes.
4   Q        Regarding your job duties, you also mentioned the
5        accommodations process; do I have that right?
6   A        Yes.
7   Q        And what was your role, specifically as director
8        of human resources, with respect to the district's
9        accommodations process for employees experiencing
10       disabilities?
11  A        I oversaw it.  We had an employee that worked on
12       it on accommodations.  So we identify whether the
13       employee indicates whether they need an
14       accommodation.  We see that that is something that
15       somebody needs.
16  Q        Okay.  And back during the year that Ms. Smith had
17       her injury and accommodations needs, who was involved
18       in that accommodations process?
19  A        I was.
20  Q        And you mentioned you were overseeing someone as
21       well.  Was that also in relation to Ms. Smith?
22  A        No.  I did the accommodation for Ms. Smith.
23  Q        And just broadly speaking, can you describe the
24       general process that you or the district would go
25       through for determining an appropriate accommodation
```

Linda Krininger
10/3/2022

1        when someone has a disability?

2   A        Absolutely.

3            Essentially, when someone is on FMLA, when they

4        are coming back, we determine if there are any

5        restrictions that are going to be needed upon their

6        return.  And we go into the accommodation process and

7        then work with the employee, gather information from

8        their doctor, explore some.  You know, our form also

9        invites employees to be able to say what they believe

10       an accommodation process looks like.

11           So then we have a meeting to discuss that and,

12       typically, are able to come up with something at that

13       meeting to be able to say this is what we will be

14       able to do.  Sometimes we have to go back and look

15       into costs.

16           I'm just doing general, right?  So that's what we

17       typically do.  And then we put a plan together and

18       then we send that out.

19   Q       Okay.  And when you say you "send that out," is

20       that -- is there a form or a format that the district

21       uses for when that plan is finalized?

22   A       It's correspondence through email as a record.

23   Q       And similar to the investigatory process you spoke

24       to a moment ago, is the reasonable accommodations

25       process also documented by the district or its HR

Linda Krininger
10/3/2022

```
 1      folks?
 2  A      I'd say it is.  Probably not to the extent of
 3      investigations.
 4  Q      And likewise, what's the overarching purpose of
 5      communicating or documenting the RA -- reasonable
 6      accommodation process in writing?
 7  A      To make sure that we have followed up with the
 8      employee and to make sure that we have -- everybody
 9      is in knowledge of what the accommodation needs to
10      be; that the supervisor understands the restrictions
11      or accommodations that are needed.
12  Q      The process that we just talked about for
13      reasonable accommodation, was that followed with
14      respect to Kristi Smith?
15  A      Yes.
16  Q      I'm going to show you what we will mark as a new
17      exhibit here and I will get it up on the screen for
18      you.
19          (Exhibit No. 110 admitted.)
20  BY MR. GILMAN:
21  Q      This is an email thread that includes you as one
22      of the authors from January 1st of 2020.  And this is
23      a 3-page exhibit.  So I'm going to let you know, it's
24      an email.  I'm going to scroll to the bottom first so
25      you can see what the first message was, all right?
```

Linda Krininger
10/3/2022

1       I guess not much.

2       Next page up, I will give you a chance to look at

3   that.  And let me know when you have had a chance to

4   do so.

5   A    Okay.

6   Q    And then I'm going to jump back up to the first

7   page.  It looks like there was some slight

8   modifications to this on the same day.  And I'll let

9   you read that as well where you make a reference to

10   some commentary by Ms. McStay.

11   A    Okay.  I'm not sure what the difference was

12   without seeing them side by side.

13   Q    Sure.  I understand.  And I will highlight for you

14   what I understood to be the main difference here is

15   just on the days of the week for her part-time

16   schedule.  This on the first page is Monday, Tuesday,

17   Thursday.  The prior email says Monday, Wednesday,

18   Friday.

19       Do you recall there been any discussion about that

20   modification?

21   A    Yes.  Yes.  I believe that had to do with Kristi's

22   doctor's appointments.

23   Q    Got it.  Thank you.  This email that we got here

24   as Exhibit -- what did we mark it as? -- 110, is this

25   the kind of documentation of the reasonable

28:4-18 Def. Obj. - ER 401-403, relevance,
speculative, relates only to uncertain,
unnamed general practice

Linda Krininger
10/3/2022

```
 1       accommodations process the district would do that you
 2       described in your prior testimony?
 3  A       Yes.
 4  Q       Have you ever heard the process of -- working with
 5       an employee to find disability accommodations, have
 6       you ever heard of the phrase "interactive process"?
 7  A       Yes.
 8  Q       Can you just summarize, what is your understanding
 9       of what is meant by the interactive process?
10  A       Recognizing that there is an accommodation that's
11       needed, gathering information, exploring different
12       accommodations, meeting with the employee, and then
13       implementing the accommodation and then monitoring
14       it.
15  Q       Can the district ever impose a reasonable
16       accommodation on an employee without first discussing
17       it with them?
18  A       That wasn't our practice.
19  Q       Without showing you each iteration, do you recall
20       that Ms. Smith, in cooperation with her physician,
21       had communicated some extensions of some of the
22       accommodations that are listed in this exhibit?
23  A       I do recall something of that nature.
24  Q       And I'm going to put another exhibit up.  We will
25       call this and ask that it be marked Exhibit 111.
```

28

Pl. Resp. - Witness implemented District's accommodations process, including as
to Smith. Testimony is relevant to show whether District acted inconsistent with
its own policies or practices when dealing with Smith. See Dkt. 46 at 23:23–24:4.
Testimony is related to the fact that removal of Smith's oversight of Teaching and
Learning was not part of the reasonable accommodations process.

Linda Krininger
10/3/2022

```
1              (Exhibit No. 111 marked.)
2    BY MR. GILMAN:
3    Q      This is a March 26th, 2020, doctor's note from
4         Ms. Smith's physician.  The first question is, as the
5         person handling Ms. Smith's reasonable accommodation,
6         would you have been receiving her doctor's notes sort
7         of in realtime while this was going on?
8    A      They didn't always come to HR.  Sometimes they
9         went to payroll.
10   Q      Okay.  Just looking at Exhibit 111, Dr. Dawson
11        communicates that Ms. Smith is released to go back to
12        work full time as of March 30th, 2020.
13             Do you recall that information coming to you or
14        learning that Ms. Smith had reached a point where she
15        didn't need the limited work schedule anymore?
16   A      Yes.
17   Q      I'm going to show you another document, and we
18        will have this marked as 112 just for reference.
19             (Exhibit No. 112 marked.)
20   Q      These are some handwritten notes.
21             First off, is that your handwriting?
22   A      No.
23   Q      Do you recognize whose handwriting that is?
24   A      I do not.
25   Q      Do you recall participating in a conference,
```

Linda Krininger
10/3/2022

| 1 | whether in person or done by phone, around March |
|---|---|

1  whether in person or done by phone, around March
2  31st, 2020, about Ms. Smith's accommodations
3  situation?
4 A    I don't recall, but if my initials are there.  But
5  I don't recall.
6 Q    And let me also -- just so you can see some other
7  pages within this Exhibit 112.
8       It's a 3-page document.  You are looking at the
9  first -- I guess the second page is not much of a
10  page.  And then there is a what looks like a printed
11  out email with some scribbled out text.  Is that
12  something that -- the last page of this exhibit, is
13  that something that you did or somebody else?
14 A    I don't recall.
15 Q    Show you another email.  We'll mark it as exhibit
16  113.
17       (Exhibit No. 113 marked.)
18 BY MR. GILMAN:
19 Q    And this is an April 6th, 2020, and again, there
20  is a multi-page exhibit.  So I'm going to scroll to
21  the bottom because it's the way the email thread
22  flows.
23       The first email at the end of this email is an
24  email from you on April 6th, 2020.  And it's an
25  accommodations update per the physician's note on

Linda Krininger
10/3/2022

1    March 26th.  I will give you a chance to read this

2    real quickly.  And let me know when you are ready to

3    flip pages.

4  A    Do you want me to read from the top, or am I

5    reading the first one from April 6th?

6  Q    Just right here at the bottom --

7  A    Okay.

8  Q    I'm highlighting -- right.

9  A    Okay.

10 Q    And I'm scrolling to the next page of the email so

11   you can finish reading it.

12 A    Okay.

13 Q    So having reviewed this, at either late March or

14   early April, did you determine, in cooperation with

15   Ms. Smith, that her accommodations no longer required

16   a limited work schedule?

17 A    Based on her doctor's note --

18 Q    Other than --

19 A    -- yes.

20 Q    Thank you.

21   Other than no longer having a reduced work

22   schedule, the district would continue to maintain the

23   LED lighting within her office suite.  That was an

24   existing accommodation that would continue?

25 A    Yes.

Linda Krininger
10/3/2022

```
1   Q      I'm going to show you another exhibit.  Ask that
2          we have it marked as 114.
3             (Exhibit No. 114 marked.)
4   BY MR. GILMAN:
5   Q      This is a July 8th, 2020, doctor's note, again,
6          from Dr. Dawson.  Give you a chance to look at that
7          and then let me know when you are ready.
8   A      I'm done.
9   Q      Okay.  Do you recall that at least some of
10         Ms. Smith's disability accommodations extended
11         essentially into the 2020-'21 academic year?
12  A      I don't recall, but if it says so on this note,
13         they must have.
14  Q      Fair enough.  And slightly different question.  Do
15         you recall anything that would have occurred in
16         2020-'21 academic year where the district refused to
17         provide any accommodation per Ms. Smith's doctor's
18         notes?
19  A      No.
20  Q      Show you another exhibit that's previously
21         utilized, Exhibit No. 39.
22             Actually, before I show you that, do you recall in
23         approximately April of 2020 conducting an interview
24         of Holly Shaffer regarding a potential human
25         resources issue?
```

32:22-33:14 Def. Obj. 801-802 hearsay, 805 double-hearsay, 401-403 sepculative, vague, incomplete, confusion, 602 lack of firsthand knowledge and recollection

Linda Krininger
10/3/2022

1    A      There was a meeting.

2    Q      What brought about the meeting with Ms. Shaffer?

3    A      I recall something in the nature of there was some

4          conversation about something that was said about

5          Kristi.  And she contributed to that and said, oh,

6          something about somebody across the hall -- down the

7          hall.

8    Q      And how did you come to participate in an

9          interview with Ms. Shaffer about this issue?

10   A      I was asked to talk to her to see if she had said

11         that.

12   Q      By whom?

13   A      Probably Lori McStay because she was my

14         supervisor.

15   Q      Did you ever have any discussions with Ron Banner

16         about this issue related to Ms. Shaffer?

17   A      I don't recall that.

18   Q      Here I am going to show you now that Exhibit 39.

19         These are some handwritten notes.  First off, can you

20         see them?

21   A      Yes.

22   Q      And I appreciate that these are not your

23         handwritten notes.  Ms. McStay has testified that

24         they were hers from April 16th, 2020.

25         So I want to ask you something -- again, just

33

Pl. Resp. - Statements by Shaffer are not hearsay because they go to notice to District of potential harassment toward Smith. They are relevant to whether the District responded consistent with its obligations to investigate all potential discrimination or ignored information and obligations in retaliation against Smith. See Dkt. 46 at 23:23–24:4. Statements by McStay are not hearsay because she is speaking agent for District and also goes to notice. Witness testified to extent of her knowledge.

Linda Krininger
10/3/2022

1    recognizing these are Ms. McStay's notes of the
2    conversation.  Here in the middle of the page, it
3    says, quote, last year every time you saw Ron and
4    Kristi -- excuse me.  I need to say that again.
5        Quote, "Last year, every time you saw Ron you saw
6    Kristi.  Then suddenly that was not the case
7    anymore."
8        Do you see where it says that?
9  A    Yes.
10 Q    Do you recall from this conversation with
11     Ms. Shaffer her saying anything to that effect?
12 A    She may have.  I don't recall.
13 Q    Do you -- based on just your personal observations
14     at the district, do you agree or disagree with
15     Ms. Shaffer's comment there?
16        MR. HARRINGTON:  Objection to form.
17        THE WITNESS:  They may have been together.  I
18     don't -- I don't recall always seeing them together.
19 BY MR. GILMAN:
20 Q    At any point or just in the '19-'20 school year?
21 A    Well, in -- she is saying every time you saw Ron,
22     you saw Kristi.  They may have been down the hall,
23     but I just can't say that every time I saw either one
24     of them they were together.
25 Q    Let me ask maybe a different question.

35:21-37:4 - 801-802 hearsay, Case 3:21-cv-05767-JHC   Document 62   Filed 01/06/23   Page 60 of 82
hearsay, 401-403 speculative, vague,
incomplete, confusing, cumulative, duplicative,
602 lack of firsthand knowledge and recollection.

Linda Krininger
10/3/2022

| | |
|---|---|
| 1 | After Ms. Smith had returned from her FMLA leave, |
| 2 | did you, from your personal observations, see that |
| 3 | she was spending less time than she had previously |
| 4 | with Mr. Banner? |
| 5 | A    That calls for speculation and I'm not comfortable |
| 6 | with that, because I wouldn't know if they were |
| 7 | together or not.  Kristi was in her office a lot |
| 8 | because of her accommodation. |
| 9 | Q    Did you observe any kind of change in Mr. Banner |
| 10 | and Ms. Smith's working relationship from before to |
| 11 | after her head injury? |
| 12 | MR. HARRINGTON:  Object to the form. |
| 13 | THE WITNESS:  No, I did not. |
| 14 | BY MR. GILMAN: |
| 15 | Q    At the bottom of Ms. McStay's notes, there is a |
| 16 | sentence, "Sometimes he overestimates his authority," |
| 17 | end quote. |
| 18 | Do you recall Ms. Shaffer raising any concerns |
| 19 | about Mr. Banner overestimating his authority? |
| 20 | A    Not to me. |
| 21 | Q    I'm going to show you what was previously marked |
| 22 | as Exhibit No. 25.  You should see it up on your |
| 23 | screen here. |
| 24 | Are these the notes that you typed up about your |
| 25 | April 16th, 2020, meeting with Ms. Shaffer and |

Pl. Resp. - Testimony authenticates Trial Ex. 14 (Dep. Ex. 25). Statements by
Shaffer are not hearsay because they go to notice to District of potential
harassment toward Smith and whether District's failure to act was retaliatory.
See Dkt. 46 at 23:23–24:4. Witness testified to extent of her knowledge.

35

Linda Krininger
10/3/2022

1           Ms. McStay?

2    A       Yes.

3    Q       Did you make these notes contemporaneously, or are

4       these ones that you wrote after the fact?

5    A       After the fact.

6    Q       And do you know approximately how long after the

7       fact:  Like the same day?  Same week?  Same month?

8    A       Same day.

9    Q       So the first sentence says, quote, "We have

10      received a concern regarding an allegation of

11      disparaging comments by you against Clover Park

12      leadership."  Against whom in Clover Park leadership

13      had Kristi Smith allegedly made -- or excuse me had

14      Holly Shaffer allegedly made disparaging comments?

15   A       Sorry.  You are asking me to go back in time and

16      try to remember this.  I believe it was the

17      superintendent's office that she was referring to.

18   Q       And just to be clear, there was an allegation that

19      Holly Shaffer was making disparaging comments about

20      the superintendent's office as far as how it was

21      treating Kristi Smith?

22   A       That's what it looks like.  Specifically, it was

23      reported to superintendent that you indicated to a

24      coworker that they are making it hard for Kristi

25      Smith to be successful.

Linda Krininger
10/3/2022

1    Q      And, again, that "they" that you put in quotation

2           marks, is that also referring to the superintendent's

3           office?

4    A      It must be.

5    Q      A little bit further down there, there is a

6           sentence that refers to student services is

7           collateral damage right now.

8           Having read that, does that refresh your memory

9           about what Ms. Shaffer's concerns were during this

10          meeting?

11   A      I don't know what her -- her perception of that

12          is.  Holly felt like student services never received

13          the budget that they needed to be successful.

14   Q      To your knowledge, did Ms. Shaffer ever

15          communicate to human resources that she felt that

16          what she perceived as the superintendent's hostility

17          towards Kristi Smith was, in fact, making it more

18          difficult for student services to complete its job?

19          MR. HARRINGTON:  Objection to form.

20          THE WITNESS:  I'd say this is the first time

21          we've heard that.

22   BY MR. GILMAN:

23   Q      Was that your understanding that that was what

24          Ms. Shaffer was complaining about based on your

25          meeting with her in April of 2020?

38:14-24 Pl.' Obj. - Answer to question is non-responsive and speculates ("I think . . . .") as to Ms. Shaffer's motives without personal knowledge.

Case 3:21-cv-05767-JHC  Document 62  Filed 01/06/23  Page 63 of 82

Linda Krininger
10/3/2022

```
 1   A       Repeat your --
 2              MR. HARRINGTON:  Object to form.
 3   BY MR. GILMAN:
 4   Q       Following -- as a result of your April 16th, 2020,
 5           meeting with Holly Shaffer, did you personally
 6           understand that Holly Shaffer was complaining that
 7           her department was suffering because the
 8           superintendent was mistreating Kristi Smith who had
 9           been put in charge of that department?
10              MR. HARRINGTON:  Objection to form.
11              THE WITNESS:  I don't think that's exactly what
12           she was trying to say.
13   BY MR. GILMAN:
14   Q       What do you think Ms. Shaffer was trying to say in
15           this April 16th, 2020, meeting?
16   A       I think she had to defend the fact that she had
17           said some stuff about the superintendent.  And
18           Kristi's allowed to be successful.  And so I think
19           she turned it around.  And that's how we heard what
20           we heard.
21              And I think that she wanted to interview for the
22           student services.  Not her personally, but she wanted
23           it to be an interview process versus somebody
24           appointed.
25   Q       During this meeting, did Ms. Shaffer inform human
```

38:25-39:19 Def. Obj. - 801-802 hearsay, 805 double-hearsay, 401-403 speculative, vague, incomplete, confusing, cumulative, duplicative, 602 lack of firsthand knowledge and recollection

Case 3:21-cv-05767-JHC    Document 62    Filed 01/06/23    Page 64 of 82

Linda Krininger
10/3/2022

```
 1              resources that she had witnessed others disparaging
 2              Kristi Smith specifically in relation to her medical
 3              condition?
 4    A         I don't recall that.
 5    Q         A little further down the page, and I will
 6              highlight it here too, is a sentence that starts,
 7              "Holly indicated she heard."  Do you see that?
 8    A         Yep.
 9    Q         And it says, quote, "Holly indicated she heard a
10              lot of people commenting about Kristi when she was
11              out.  There was a lot of backstabbing comments
12              questioning whether or not she actually had a
13              concussion and how maybe she was faking it," end
14              quote.
15              Why did you write that note?
16    A         Well, she must have said that, right?  So she --
17              Holly was one of them that had said some disparaging
18              comments about Kristi.  And then she apologized once
19              Kristi got back.
20    Q         Did you understand from your conversation with
21              Ms. Shaffer that's documented in your notes here in
22              Exhibit 25 that she was alerting human resources to
23              the fact that other Clover Park School District
24              employees were questioning the voracity of
25              Ms. Smith's injury?
```

Pl. Resp. - Statements by Shaffer are not hearsay because they go to notice to District of potential harassment toward Smith and District's response. See Dkt. 46 at 23:23–24:4. Witness testified to extent of her knowledge.

40:4-42:13 Def. Obj - 801-802 hearsay, 805 double-hearsay, 401-403 speculative, vague, incomplete, confusing, cumulative, duplicative, 602 lack of firsthand knowledge and recollection.

Linda Krininger
10/3/2022

```
 1              MR. HARRINGTON:  Objection to form.

 2              THE WITNESS:  Ask your question again.

 3   BY MR. GILMAN:

 4   Q      Did you understand from your meeting with Holly

 5          Shaffer in April 16th of 2020 that she was saying

 6          that there were other Clover Park School District

 7          employees, not including herself, who were

 8          questioning Kristi Smith's medical condition?

 9   A      She may have said that.  You are asking me if they

10          alerted HR?  If she alerted?

11   Q      Yes.

12   A      I think she was making conversation.  I don't know

13          as much as it was an alert.

14   Q      Okay.  The three people in this meeting on April

15          16th, 2020, included the executive director of human

16          resources, Lori McStay, correct?

17   A      Correct.

18   Q      And who is Lori McStay's second in command at the

19          time this meeting occurred?

20   A      Are you talking about me being the HR director or

21          what?

22   Q      Right.  I mean the next in the organizational

23          hierarchy for human resources, that was you, correct?

24   A      Correct.

25   Q      And at the time, you and Ms. McStay were the two
```

Pl. Resp. - Statements by Shaffer are not hearsay because they go to notice to District of potential harassment toward Smith and District's response. Relevant for the same reason. See Dkt. 46 at 23:23–24:4. Witness testified to extent of her knowledge.

40

Linda Krininger
10/3/2022

1      highest ranking HR professionals in Clover Park

2      School District, correct?

3 A      Yes.

4 Q      And during that meeting in April 16th of 2020, did

5      Ms. Shaffer communicate to you that beyond herself,

6      other Clover Park School District employees were

7      openly questioning Kristi's Smith's medical

8      conditions?

9           MR. HARRINGTON:  Objection to form.

10           THE WITNESS:  She did.

11 BY MR. GILMAN:

12 Q      I'm sorry.  Could you say your answer again,

13      please.

14 A      She did.

15 Q      What steps did the district take upon learning

16      this information to investigate potential comments

17      being made by other administrators about Kristi

18      Smith's medical situation?

19           MR. HARRINGTON:  Objection to the form.

20           THE WITNESS:  I don't recall.

21 BY MR. GILMAN:

22 Q      Was there an investigation conducted based on

23      specifically looking into the issue of whether

24      administrators were openly questioning Kristi's

25      Smith's medical condition?

Linda Krininger
10/3/2022

```
 1              MR. HARRINGTON:  Object to form.
 2              THE WITNESS:  And this is vague.  She says a
 3      lot of people.  So she didn't define.  She didn't
 4      specifically identify anybody.
 5  BY MR. GILMAN:
 6  Q       Did you ask her who --
 7  A       I don't -- I don't recall.
 8  Q       Did the district conduct any investigation into
 9      who the other individuals were that Ms. Shaffer was
10      speaking about who were making comments about Kristi
11      Smith or her injuries?
12              MR. HARRINGTON:  Objection.  Form.
13              THE WITNESS:  I don't -- I don't recall.
14  BY MR. GILMAN:
15  Q    If we could go to the second page of Exhibit 25,
16      it's a continuation of your notes here.
17          It says, according to your notes, Ms. Shaffer
18      reported, quote, "There were a lot of people that
19      made a lot of inappropriate comments and especially
20      about Kristi," end quote.
21          What is this note referring to?
22  A    I think it's the prior sentence.  Holly feels that
23      maybe we aren't all assuming best intention as
24      leaders.  And she's saying that there were other
25      people making inappropriate comments and about
```

43:10-13 Def. Obj. Case 3:21-cv-05767-JHC   Document 62   Filed 01/06/23   Page 68 of 82
double-hearsay, 401-403 speculative, vague,
incomplete, confusing, cumulative, duplicative,
602 lack of firsthand knowledge and recollection

Linda Krininger
10/3/2022

 1    Kristi.  So I don't think it was just about Kristi.

 2    I think she feels that we all had an opportunity to

 3    grow.

 4  Q    Okay.  Well, let's jump two paragraphs above that

 5    where your notes of your conversation with

 6    Ms. Shaffer state, quote, "Holly indicated that she

 7    participated in some conversation about Kristi.  And

 8    after she reflected on it, she went to Kristi and

 9    told her and apologized," end quote.

10       Did Ms. Shaffer say during this meeting that she

11    herself participated in conversations with others

12    that were disparaging of Kristi Smith?

13  A    Yes.

14  Q    Would you agree that it takes more than one person

15    to have a conversation?

16       MR. HARRINGTON:  Object to form.

17       THE WITNESS:  Yes.

18  BY MR. GILMAN:

19  Q    Did you come to learn at any point that

20    Ms. Shaffer was upset by the fact that she got called

21    in by human resources, you and Ms. McStay, to discuss

22    this issue?

23  A    Yes.

24       MR. HARRINGTON:  Object to the form.

25  BY MR. GILMAN:

Pl. Resp. - Statements by Shaffer are not hearsay because they go to notice to
District of potential harassment toward Smith and District's response or lack of
response. Relevant for the same reason. See Dkt. 46 at 23:23–24:4. Witness
testified to extent of her knowledge.

Linda Krininger
10/3/2022

```
1    Q      How did you learn that?
2              MR. HARRINGTON:  Object to the form.
3              THE WITNESS:  She indicated as such.
4    BY MR. GILMAN:
5    Q      I'll show you what was previously marked as
6       Exhibit No. 38.
7              MR. HARRINGTON:  Eric, I need five minutes.
8              MR. GILMAN:  For?
9              MR. HARRINGTON:  Do I have to tell you?  I need
10      a bathroom break.
11             MR. GILMAN:  I'm sorry.  I thought I -- could I
12      ask one quick question?
13             MR. HARRINGTON:  Yeah.  One question is fine.
14   BY MR. GILMAN:
15   Q      Ms. Krininger, are you represented by counsel here
16      today?
17   A      Yes.
18   Q      By whom?
19   A      Mark O'Donnell.  Preg O'Donnell, so Jason.
20   Q      He's acting as your attorney today?
21   A      Yes.
22             MR. GILMAN:  All right.  We can go off the
23      record.
24             MR. HARRINGTON:  Thanks.
25          (A break was taken.)
```

Pl. Resp. - Goes to credibility and bias on the basis that District and witness have same lawyer. Also District gave the witness a thing of value (free legal representation) days before she was to give sworn testimony for this case.

44

Linda Krininger
10/3/2022

```
1    BY MR. GILMAN:
2    Q      Ms. Krininger, when you were at Clover Park School
3           District, and specifically as the director of human
4           resources, was your job to set policy for the
5           district's administration or implement policy
6           decisions that had been made by others?
7    A      Implement, made by others.
8    Q      Before we took a break, you mentioned that
9           Mr. O'Donnell's office was representing you today.
10          Did you sign a new representation agreement with
11          Mr. O'Donnell's firm?
12   A      A new representation agreement?  What do you mean?
13   Q      Have you signed a contract with the Preg O'Donnell
14          law firm?
15   A      I have not.
16   Q      How do you know that you are being represented by
17          the district's attorneys here today?
18   A      Because they called me last week and they asked me
19          if I wanted representation.
20   Q      Jumping back to the exhibit we were looking at
21          before the break, No. 38, you are familiar with this
22          letter?
23   A      Vaguely.
24   Q      And I'm showing you the second page as well.  It's
25          a 2-page exhibit.  The correspondence is from Holly
```

Linda Krininger
10/3/2022

| 1 | | Shaffer. |
| 2 | | My question is did you have any personal |
| 3 | | involvement in the district's process for addressing |
| 4 | | the formal complaint that Ms. Shaffer made in |
| 5 | | Exhibit 38? |
| 6 | A | No. |
| 7 | Q | Did you have -- other than the April 16th, 2020, |
| 8 | | meeting with Ms. Shaffer, did you have any other |
| 9 | | interactions with Holly Shaffer about her commentary |
| 10 | | about her observations about how Kristi Smith was |
| 11 | | being treated or her subsequent complaint to the |
| 12 | | district? |
| 13 | A | I don't recall. |
| 14 | Q | Show you what was Exhibit 40 in a prior |
| 15 | | deposition.  These are, again, some of Ms. McStay's |
| 16 | | notes from May 20th of 2020.  I didn't see any |
| 17 | | indication in these notes that you were present for |
| 18 | | the meeting, but I wanted to ask.  Do you have any |
| 19 | | independent recollection of being involved in any |
| 20 | | subsequent meetings with Holly Shaffer or Ms. McStay? |
| 21 | A | I don't believe I did. |
| 22 | Q | I'm going to show you a couple of exhibits that, |
| 23 | | to my understanding, may be related.  But I want to |
| 24 | | show them to you one at a time here.  The first was |
| 25 | | previously marked as Exhibit 83. |

Linda Krininger
10/3/2022

```
 1          And this is a multipage email thread.  And so what
 2     I want to do is scroll down to the bottom of it
 3     again.  And we're at the last page of this particular
 4     exhibit.
 5          I'm going to scroll up one page to an April 19th,
 6     2020, email from Kristi Smith to Lori McStay.  And if
 7     you look right above that, Ms. McStay subsequently
 8     forwarded that email to Mr. Banner and yourself and
 9     the subject line here is "concern."
10          First off, do you recall being involved in the
11     response to Ms. Smith's concern email?
12  A    I was not.
13  Q    Okay.  Down here towards the bottom of the page
14     where Ms. Smith's complaint or concern email begins,
15     could you just go ahead and just read that to the
16     bottom.  And then let me know when you are ready to
17     switch pages.
18  A    Okay.
19  Q    And I will scroll pages.
20  A    Is there any way you can make this a little bit
21     bigger?  I'm really struggling.
22  Q    Of course.  I will see what I can do.
23  A    That's good.  Thank you.
24  Q    Of course.
25  A    Okay.
```

48:3-49:16 Def. Obj. - FER 401-403 vague, relevance, speculative, confusing, cumulative, duplicative, 602 lack of firsthand knowledge and recollection

a Krininger
10/3/2022

1   Q       Did you have a chance to read that?

2   A       Yep.

3   Q       Okay.  And then I said I would show you two

4           exhibits.  And the second one is No. 84.  And this

5           was previously used in a deposition.

6           The header shows that -- I believe this was

7           printed from your email.  And I will represent to you

8           that it was received in response to a public records

9           act request.

10          Below here, there is some handwritten commentary

11          in these notes.  And I will also show you the -- I'm

12          sorry.  This is a single page.  It looks like we did

13          not get the second page of this exhibit scanned in.

14          But anyway, while we've got it here, is this your

15          handwriting in the margins --

16  A       It is.

17  Q       Sorry, Ms. Krininger.

18          So having seen this note page, does that change

19          your response at all about whether you were involved

20          in the district formulating a response to Kristi

21          Smith's concern email?

22  A       No, it doesn't change my response.  I wasn't

23          involved.  Those are my own notes.

24  Q       These were your own notes?

25  A       Mm-hmm.

Pl. Resp. - Authenticates Trial Ex. 15. Testimony is relevant because the exhibit shows District HR Director's contemporaneous understanding that reason for demotion was because "Brian took over in her absence so made sense to keep it [Teaching and Learning] there."

Linda Krininger
10/3/2022

1   Q       Yes?

2   A       Yes.  Sorry.

3   Q       And why did you create these notes?

4   A       I was just reading through what was sent to me,

5        and I just wrote some notes on it.

6   Q       Okay.  Did you ever discuss your notes with anyone

7        else?

8   A       I probably would have shared them with Lori

9        McStay.

10  Q       Okay.  I mean, did you have a meeting or a

11       discussion to go over how to respond to Ms. Smith's

12       concern email?

13  A       No.  Lori probably worked with the superintendent

14       to determine what -- the reason why they include me

15       on this is mostly because I keep records.  So I just

16       would keep it for records.

17  Q       Okay.  Along the right gutter here, it says,

18       "Heard mean girl term.  Didn't know what that means."

19       Do you recall what that is in reference to?

20  A       Yeah.  I've heard that.  I've heard that term that

21       they were using, but I don't recall what it is.  I

22       remember that Kristi used that term, the mean girls.

23  Q       And then the information that you are including in

24       these notes -- and I will note for the court

25       reporter, also looks like the second page of this

Linda Krininger
10/3/2022

1       exhibit may not have gotten scanned in, but it's a

2       continuation of these notes.

3           One of the statements in Ms. Smith's concern email

4       was, quote, "Over the past weeks, the situation has

5       escalated.  And I understand that others who have

6       recognized the unfair way in which I have been

7       treated have been called in and questioned about it,"

8       end quote.

9           And I recognize you can't see it where you are

10      right now, but in pen, you had written "Holly" over

11      that.  Where did you have the information that that

12      was Holly who had made that --

13  A   Well, Holly was --

14  Q   Why did you write "Holly"?

15  A   Holly was the only one that we were aware of,

16      right?

17  Q   I'm going to hop back to Exhibit No. 83.  And I'll

18      scroll back up, because there is some text that's

19      been added to the same email.  And it's kind of in

20      all caps text here.  Do you see where I'm looking?

21  A   Yeah.

22  Q   All right.  And then above that, there is also

23      several bullet points that are all caps.  And I'm

24      going to go all the way to the top.  I just want you

25      to see where I'm referring to the all caps text in

51:5-52:17 Def. Obj. - 602 lack of firsthand knowledge and recollection, ER 401-403, vague, relevance, speculative, confusing, cumulative, duplicative, 602 lack of firsthand knowledge and recollection, 801-802 hearsay, 805 double-hearsay

Case 3:21-cv-05767-JHC   Document 62   Filed 01/06/23   Page 76 of 82

Krininger
/3/2022

```
 1        response to some of the things written by Ms. Smith.
 2            Do you know who wrote these all caps messages into
 3        this document?
 4    A       No, I am not -- I don't know.
 5    Q       Other than Lori McStay, you, and Superintendent
 6        Banner, was anybody else involved in the district
 7        formulating a response to Kristi Smith's email with
 8        the subject line "concern"?
 9    A       And I don't think I was involved, but I am not
10        aware that it was anyone other than Lori and Ron.
11    Q       This highlight -- I'm sorry.  I jumped back to
12        Exhibit 84 on the first page.  There is highlights
13        around, "If my change in employment status was
14        actually a reorganization, did anyone other than me
15        have their pay or responsibility diminished?"
16            First off, are you the one who highlighted that?
17    A       I don't recall.
18    Q       Okay.  It also says, "reviewed this."  What did
19        you do to review this particular point?
20    A       I don't know.
21    Q       Did you speak with anyone?
22    A       I couldn't tell.
23    Q       Okay.  And then below that there is sort of an
24        asterisk.  And it says, "Brian took over in her
25        absence, so it made sense to keep it there."
```

Pl. Resp. - Authenticates Trial Ex. 15. Testimony is relevant because the exhibit shows District HR Director's contemporaneous understanding that reason for demotion was because "Brian took over in her absence so made sense to keep it [Teaching and Learning] there." Witness testified to extent of her knowledge. No hearsay because statements are by District's managers and also go to notice.

Linda Krininger
10/3/2022

1        What does that note mean?

2   A        That's got to be teaching and learning.

3   Q        Okay.  So Brian took over teaching and learning in

4        Kristi Smith's absence, so it meant to keep teaching

5        and learning with him; is that what you are

6        communicating there?

7   A        I believe that -- on my own notes, that's what I'm

8        writing, yes.

9   Q        Okay.  Where did you get that information from?

10  A        That Brian took over?

11  Q        Yes.

12  A        While she was out?  Well, I'm sure somebody spoke

13       to me.  Probably Lori spoke to me and shared that

14       with me.

15  Q        Okay.  And the notion that it made sense to keep

16       it there, is that --

17  A        For continuity.

18  Q        Okay.  Was there any discussion that you recall

19       about kind of a need for continuity with respect to

20       teaching and learning?

21  A        I think I've seen it, but I don't -- I think it

22       was in the board brief that you showed me earlier.

23  Q        And maybe more conceptually, can you speak to

24       the -- sort of the issue or importance of continuity

25       with respect to teaching and learning?

53:18-25 Def. Obj. Case 3:21-cv-05767-JHC   Document 62   Filed 01/06/23   Page 78 of 82
ER401-403 misleading, confusing, cumulative,
duplicative, vague, irrelevant)

Linda Krininger
10/3/2022

```
 1              MR. HARRINGTON:  Objection to form.
 2              THE WITNESS:  I don't believe I can.  But I
 3         would -- I mean, it makes sense if somebody is there
 4         and her time was limited as when she was coming back.
 5         I think they were just working on some big projects,
 6         if I had to speculate, which I don't want to do.
 7    BY MR. GILMAN:
 8    Q         Who is Terry Herbert?
 9    A         Terry Hebert is a secretary.  She -- I want to say
10         it might be the deputy superintendent's secretary.
11    Q         Did you ever speak with Ron Banner about any of
12         the changes to Kristi Smith's duties during the
13         2019-2020 school year?
14    A         I don't recall that I did.
15    Q         And did you ever speak to Mr. Banner about the
16         dissolving of Kristi Smith's position in 2020?
17    A         I did not.
18    Q         During the reasonable accommodations process for
19         Ms. Smith, did Ms. Smith ever request that teaching
20         and learning be removed from her oversight?
21    A         Not during the meetings we held.
22    Q         Did Ms. Smith at any time communicate to you that
23         she had any desire for teaching and learning to be
24         removed from her oversight?
25    A         She never communicated that to me.
```

Pl. Resp. - There is no legal conclusion, just facts. District's noncompliance with
its own reasonable accommodations process (to which Witness testified earlier) is
relevant to issue of discrimination or retaliation.

53

Linda Krininger
10/3/2022

```
1   Q      All right.  To your knowledge, did Kristi Smith
2          ever communicate to anybody that she wanted teaching
3          and learning removed from her responsibilities?
4   A      I can't answer that.
5   Q      As part of the reasonable accommodations process,
6          did you ever inform Kristi Smith that the district
7          was contemplating removing teaching and learning from
8          her responsibilities?
9   A      I don't believe that we did that, but if we did
10         it, it would be under the direction of the
11         superintendent.  It wouldn't be something that would
12         be part of the accommodation process.
13  Q      Why not?
14  A      Because we dealt with things that had to do with
15         her auditory and her restrictions regarding light and
16         overstimulation, that type of thing.
17  Q      Are you saying that changing job duties can never
18         be part of a reasonable accommodation process?
19  A      I'm not saying that at all.  I'm just saying it
20         wasn't discussed.
21  Q      Okay.  And that's what I want to make sure we're
22         clear on, is changing job duties was not part of the
23         reasonable accommodations process that you assisted
24         with relating to Kristi Smith?
25  A      Right.  We didn't do a transitional assignment.
```

53:6-14 Def. Obj. - legal conclusion,
ER401-403 misleading, confusing, cumulative,
duplicative, vague, irrelevant)

Linda Krininger
10/3/2022

```
 1   Q      Did Kristi Smith ever make any request that you're
 2          aware of to be given oversight of student services?
 3   A      Are you asking if she requested that?
 4   Q      Well, it's actually broader than that, but let's
 5          be more specific first.
 6          As part of the reasonable accommodations process,
 7          did Kristi Smith ever ask to have her duties shifted
 8          to student services?
 9   A      No.
10   Q      As part of the reasonable accommodations process,
11          did anyone ever communicate to Ms. Smith that she
12          would be given responsibility over student services?
13   A      Not as part of the reasonable accommodation
14          process.
15   Q      How about in any -- well, okay.
16          All right.  Ms. Krininger, that's all the
17          questions I have.
18          Actually, one just logistical.  I'm not sure
19          what -- whether the representation relationship
20          between you and the district will be ongoing.
21          Inasmuch as there is a trial in this matter that
22          might require the service of papers on you, trial
23          attendance subpoena to testify, is that something
24          that we can serve through the district's counsel, or
25          should we go directly to you if that becomes
```

55

Pl. Resp. - There is no legal conclusion, just facts. District's noncompliance with
its own reasonable accommodations process (to which Witness testified earlier)
is relevant to issue of discrimination or retaliation.

Linda Krininger
10/3/2022

1    necessary?

2  A     You can serve it through the district's counsel.

3          MR. GILMAN:  Okay.  Thank you.  I have no

4    further questions.

5          MR. HARRINGTON:  No questions.

6          THE COURT REPORTER:  Okay.  Would you like to

7    have an opportunity to read through the transcript

8    and sign that it is all correct, or would you like to

9    waive that?

10          THE WITNESS:  I'd like to do that.

11          MR. GILMAN:  I will order, please.

12          MR. HARRINGTON:  We will take a copy.

13        (Deposition concluded at 1:00 p.m.)

14        (Signature reserved.)

15

16

17

18

19

20

21

22

23

24

25

Linda Krininger
10/3/2022

```
1                    REPORTER'S CERTIFICATE

2

3        I, JESSICA L. TURNER, the undersigned Certified

4   Court Reporter, pursuant to RCW 5.28.010 authorized

5   to administer oaths and affirmations in and for the

6   State of Washington, do hereby certify that the sworn

7   testimony and/or proceedings, a transcript of which

8   is attached, was given before me at the time and

9   place stated therein; that any and/or all witness(es)

10  were duly sworn to testify to the truth; that the

11  sworn testimony and/or proceedings were by me

12  stenographically recorded and transcribed under my

13  supervision to the best of my ability; that the

14  foregoing transcript contains a full, true, and

15  accurate record of all the sworn testimony and/or

16  proceedings given and occurring at the time and place

17  stated in the transcript; that a review of which was

18  requested; that I am in no way related to any party

19  to the matter, nor to any counsel, nor do I have any

20  financial interest in the event of the cause.

21        WITNESS MY HAND and SIGNATURE this 10th day of

22  October, 2022.

23

24  _____

25  JESSICA L. TURNER, CCR
    Washington Certified Court Reporter, CCR 3187
```